[No. 44649-9-II.   Division Two.   July 22, 2014.]

*In the Matter of the Welfare of* H.Q.

542

*Maureen M. Cyr* (of *Washington Appellate Project*), for appellant.

*Robert W. Ferguson, Attorney General,* and *Peter E. Kay, Assistant,* for respondent.

¶1 PENOYAR, J.* — C.Q. appeals the involuntary termination of his parental rights. C.Q. is the father of H.Q., a girl born in 2008.[1] C.Q. has a good relationship with H.Q. but is unable to parent her because of disabilities caused by a head injury when he was a child. As a result, C.Q. was faced with termination of his parental rights.

¶2 C.Q. sought to voluntarily relinquish his rights in order to enter into an open-communication adoption agreement with H.Q.'s prospective adoptive parents because that was the only way for him to have an enforceable right to continue a relationship with H.Q. after the termination. The juvenile court did not conduct a hearing to determine C.Q.'s competence to voluntarily relinquish his parental rights. Instead, it accepted the representation of C.Q.'s attorney that C.Q. was not competent to voluntarily relinquish his parental rights and subsequently involuntarily terminated those rights. Because a parent's right to voluntarily relinquish his parental rights is a fundamental right protected by due process, we vacate the termination of C.Q.'s parental rights and remand for the juvenile court to hold a hearing on C.Q.'s competence to voluntarily relinquish his parental rights and for further additional proceedings dependent on the outcome of the competency hearing.

---

* Judge Joel Penoyar is serving as a judge pro tempore of the Court of Appeals pursuant to CAR 21(c).

[1] H.Q.'s mother, C.H., voluntarily relinquished her rights and entered into an open-communication adoption agreement with H.Q.'s adoptive parents and, thus, is not a party to this appeal.

## FACTS

I. BACKGROUND

¶3 C.Q. is a 30-year-old man with disabilities caused by a head injury when he was eight or nine years old.[2] These disabilities leave him with the mental faculties of a six-year-old. Francis Peck became C.Q.'s foster parent after C.Q.'s head injury and then his legal guardian under chapter 11.88 RCW when C.Q. turned 18. Peck makes all of C.Q.'s medical and financial decisions and provides him transportation. Despite C.Q.'s disabilities, C.Q. has lived on his own in a fifth-wheel recreational vehicle trailer located near Peck's friends since June or July 2012. C.Q. is independent in feeding, bathing, and dressing himself, and he prepares his own meals, keeps his residence clean, and has maintained a job as a stock clerk.

¶4 Prior to February 2012, C.Q. lived with H.Q.'s mother, C.H. In December 2008, H.Q. fractured her leg. Due to concerns regarding H.Q.'s injury, the Department of Social and Health Services (Department) filed a dependency petition. In February 2009, C.Q. agreed to a dependency of H.Q. under former RCW 13.34.030(5)(c) (2008). In accepting C.Q.'s waiver, the juvenile court found that C.Q. understood the terms of the order he signed, including his responsibility to participate in remedial services, and understood that entry of the order started a process that could result in termination of his relationship with H.Q. The juvenile court also found that C.Q. "knowingly and willingly stipulated and agreed to and signed the order or orders, without duress, and without misrepresentation by fraud or any other party." Ex. 1, at 2.

---

[2] C.Q. has a serious brain injury as a result of his birth mother deliberately slamming his head in a car door when he was approximately eight or nine years old. He has an Axis I diagnosis of cognitive disorder affecting executive decision-making; social judgment dementia due to head trauma, provisional; adjustment disorder with low mood; moderate anxiety relating to dependency issues; mild mental retardation; a history of head injuries; suspected fetal alcohol effects; and a global assessment functioning scale of 40.

¶5 As part of the dependency, C.Q. completed a psychological evaluation in October 2009. The examiner recommended that C.Q. receive hands-on parent coaching. Eventually, H.Q. returned to the care of C.H., and in December 2009, the Department dismissed the dependency.

## II. SECOND DEPENDENCY PETITION

¶6 In August 2010, the Department filed a second dependency petition as to H.Q. on the basis of neglect due to unsanitary conditions in C.H.'s home.[3] On December 20, 2010, the juvenile court held a contested fact finding hearing and found that C.Q. had "significant mental health issues and head trauma causing developmental and cognitive delays such that he [was] currently unable to adequately care for his child." Ex. 6, at 2. The juvenile court found H.Q. dependent under former RCW 13.34.030(6)(c) (2010). On January 31, 2011, the juvenile court entered an agreed dispositional order[4] that required C.Q. to participate in parent coaching. The juvenile court also permitted C.Q. to have supervised visitation with H.Q. once per week for two hours.

¶7 The department social worker, Jean Austin, referred C.Q. for hands-on parent coaching with Debra Roo, a parenting instructor with a master's degree. Austin did not know whether Roo had expertise in working with developmentally disabled individuals, but she had used Roo in other cases with developmentally disabled parents. After two sessions with C.Q., Roo reported that further parent coaching was not an effective tool for C.Q. due to his cognitive capacity and rate of skill development during the sessions.

---

[3] C.H. had a number of pets, and there were animal feces all over the floor, such that it was hard to step on the carpet without stepping in feces. The Department was concerned because H.Q. was on the floor playing with her toys.

[4] The order indicates that a dispositional hearing was held on January 26, 2011, at which C.Q. and his guardian ad litem (GAL), Kathy Schultz, were present. It is unclear from the juvenile court's order whether it conducted a colloquy with C.Q. regarding waiver of his rights. Further, the order is stamped with "Ex Parte." Ex. 7, at 1.

The Department stopped offering this service. Thereafter, the only support offered or provided to C.Q. was supervised visitation with H.Q.

¶8 At the permanency planning hearing on September 28, 2011, the juvenile court found that C.Q. was in compliance with the court order but was not making progress toward correcting his parenting deficiencies.[5] The juvenile court also changed H.Q.'s permanent plan from reunification to adoption. That same day, the Department filed a petition to terminate C.Q.'s parental rights.[6] On January 23, 2013, the juvenile court ordered that H.Q.'s placement be changed from foster care to relative care with P.M., H.Q.'s maternal great aunt who lives in Missouri.

III. TERMINATION HEARING

¶9 Prior to the termination fact finding hearing on February 12, 2013, Laura Jorgensen, C.Q.'s attorney, submitted a trial brief indicating that C.Q.'s guardians wished to sign a relinquishment of his parental rights in order to take advantage of an open-communication adoption agreement under chapter 26.33 RCW. Jorgensen also informed the juvenile court that C.Q. was not in a position where he was competent to personally relinquish his legal rights.[7] She argued that C.Q.'s equal protection rights were violated by the Department's position that C.Q. could not voluntarily relinquish his rights through his guardians and enter into open-communication adoption under chapter 26.33 RCW because of his disability.

---

[5] The juvenile court had held its first dependency review hearing on April 13, 2011, and found that C.Q. was in compliance with the court order and was making progress toward correcting his parenting deficiencies.

[6] On December 21, 2011, the juvenile court appointed Schultz to act as C.Q.'s GAL in the termination action. On August 20, 2012, Schultz was discharged as C.Q.'s GAL in the termination action because C.Q. has a permanent guardianship.

[7] Subsequent to this, Jorgenson reported to the juvenile court that C.Q. had been permitted to sign an agreed order of dependency in 2009. Jorgenson noted, however, that she had not represented C.Q. in the prior action.

¶10 In response, the Department argued that C.Q. was unable to enter into any type of voluntary agreement to relinquish his rights and thus could not meet the necessary prerequisites under chapter 26.33 RCW. The Department asserted that the only option was to pursue involuntary termination of his rights.[8] Without addressing the issue in any manner, the juvenile court asked the Department to call its first witness.

¶11 Austin, the department social worker, testified that the permanent plan for H.Q. was for her to be adopted by P.M., who intended to support a continuing emotional relationship between H.Q. and C.Q. Austin believed that some kind of ongoing contact between C.Q. and H.Q. was in H.Q.'s best interests, although she also believed that termination was in H.Q.'s best interest so that she could be adopted and have a permanent, legal parent. Peck, C.Q.'s guardian, testified that C.Q. loved H.Q. very much and watched out for her safety when they were together. Peck had never seen C.Q. do anything to harm H.Q. and believed that he could keep her safe. Peck stated, however, that C.Q. could not independently care for H.Q. and that someone else would need to be her parental figure.

¶12 H.Q.'s guardian ad litem (GAL), Kyle Barber, testified that his preference would be to accept C.Q.'s relinquishment with an open-communication adoption agreement if the law permitted it. He stated that H.Q. knew C.Q. was her father and that she had a good relationship with him. Barber believed it would be detrimental to H.Q. if she did not have contact with C.Q. in the future, but he nevertheless said that termination was in H.Q.'s best interest because she needed legal permanence and C.Q. could not safely parent her in the long term. Barber had spoken to P.M. about adoption and believed that she intended to allow C.Q. and H.Q. to have a continuing relationship.

---

[8] The Department further stated that open-communication adoption agreements were not permitted under the involuntary termination statutes.

¶13 Following the testimony, the juvenile court found that the Department proved the elements of former RCW 13.34.180(1)(a) through (f) (2013) by clear, cogent, and convincing evidence. It found that C.Q. had the intellectual level of a six- to eight-year-old, and there was little likelihood conditions would be remedied so that H.Q. could be returned to his care in the near future. In addition, it found by a preponderance of the evidence that termination of C.Q.'s parental rights was in H.Q.'s best interest because she needed a parent who could help prepare her for the future. As to C.Q.'s ability to voluntarily relinquish his parental rights, the juvenile court stated:

> Under Washington law, there cannot be an open adoption in involuntary termination cases under RCW 13.34. An open adoption requires a voluntary relinquishment of parental rights under RCW 26.33, and the agreement of all the parties, and the adoptive parents, to an open adoption under RCW 26.33.295. The father is *apparently* not capable of voluntarily relinquishing his parental rights, and thus this case had to proceed to trial. His legal guardian participated in the trial.

Clerk's Papers (CP) at 72 (emphasis added). On March 13, 2013, the juvenile court entered an order terminating C.Q.'s parental rights to H.Q. C.Q. appeals.

## ANALYSIS

### Due Process

¶14 C.Q. argues he had a fundamental right to voluntarily relinquish his parental rights to H.Q. and that the juvenile court violated due process by failing to determine whether he was capable of voluntarily relinquishing his parental rights before proceeding with the involuntary termination hearing. We hold that a parent has a substantive due process right to pursue voluntary relinquishment of his or her parental rights as an alternative to involuntary termination. The juvenile court should have held a hearing to determine C.Q.'s competence to relinquish his parental

rights before involuntarily terminating his parental rights to H.Q. Thus, we vacate the involuntary termination of C.Q.'s parental rights and remand for the juvenile court to hold a hearing on C.Q.'s competence to voluntarily relinquish his parental rights. If the juvenile court determines that C.Q. is competent to relinquish, further proceedings should be held consistent with the competency determination and with C.Q.'s right to pursue voluntary relinquishment as an alternative to involuntary termination.[9]

¶15 Although C.Q. did not raise a due process argument at the juvenile court, we will consider it because it pertains to his substantive due process right and the fundamental fairness of the termination trial. RAP 2.5(a)(3). We review constitutional challenges de novo. *State v. Vance*, 168 Wn.2d 754, 759, 230 P.3d 1055 (2010).

A. FUNDAMENTAL RIGHT TO PARENT

¶16 The question at issue here—whether parents have the fundamental right to pursue voluntary relinquishment as an alternative to involuntary termination—is an issue of first impression in Washington. It is well settled that parents have a "fundamental liberty interest[ ]" in "the care, custody, and management of their children," which is protected by the Fourteenth Amendment to the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) ("[T]his Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment."); *In re Dependency of J.H.*, 117 Wn.2d 460, 473, 815 P.2d 1380 (1991) ("It is unquestioned

---

[9] These further proceedings would include determining whether C.Q. actually does want to voluntarily relinquish his parental rights.

that biological and adoptive parents do have a fundamental liberty and privacy interest in the care, custody and management of their children."). This fundamental liberty interest includes a parent's "fundamental right to autonomy in child-rearing decisions" and gives parents the freedom to make personal choices in matters of family life. *In re Custody of Smith*, 137 Wn.2d 1, 13, 969 P.2d 21 (1998); *see also Santosky*, 455 U.S. at 753. Natural parents do not lose these constitutionally protected interests "simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." *Santosky*, 455 U.S. at 753.

¶17 Our Supreme Court described the importance of family as follows: "The family entity is the core element upon which modern civilization is founded. Traditionally, the integrity of the family unit has been zealously guarded by the courts. The safeguarding of familial bonds is an innate concomitant of the protective status accorded the family as a societal institution." *Smith*, 137 Wn.2d at 15. Because a parent's fundamental right is protected as a matter of substantive due process under the Fourteenth Amendment, any state interference with the right to parent must be subjected to strict scrutiny and " 'is justified only if the state can show that it has a compelling interest and such interference is narrowly drawn to meet only the compelling state interest involved.' " *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 57, 109 P.3d 405 (2005) (quoting *Smith*, 137 Wn.2d at 15).

B. RIGHT TO PURSUE VOLUNTARY RELINQUISHMENT IS REQUIRED BY SUBSTANTIVE DUE PROCESS

¶18 In distinguishable cases, Division One and Division Three of this court held involuntary parental termination proceedings are substantially different from voluntary parental relinquishment proceedings because relinquishment proceedings are voluntary and nonadversarial, and do not in-

volve state action. *In re Adoption of Infant Boy Crews,* 60 Wn. App. 202, 217-18, 803 P.2d 24 (1991); *In re Adoption of Hernandez,* 25 Wn. App. 447, 452, 607 P.2d 879 (1980). Due to the lack of state action, both courts held voluntary relinquishment proceedings do not trigger due process concerns. *Crews,* 60 Wn. App. at 217; *Hernandez,* 25 Wn. App. at 452-53.

¶19 In both *Crews* and *Hernandez,* mothers in their early 20s independently decided to relinquish their parental rights to their children; the State was not involved in their decisions to relinquish their parental rights. *Crews,* 60 Wn. App. at 204-05; *Hernandez,* 25 Wn. App. at 449-50. Neither court determined whether the right to relinquish parental rights is a fundamental right, but they instead held the voluntary relinquishment proceedings at issue did not trigger due process concerns because there was no state action. *Crews,* 60 Wn. App. at 217; *Hernandez,* 25 Wn. App. at 452-53. In contrast, here, the Department did act to terminate C.Q.'s parental rights. Thus, there was state action, and we must determine whether substantive due process requires the juvenile court to allow a parent to pursue the alternative of voluntary relinquishment in order to protect the fundamental fairness of the termination trial.

¶20 As noted above, significant constitutional interests are at stake in termination proceedings. Therefore, parents are afforded greater due process rights than in a dependency proceeding. *In re Welfare of R.H.,* 176 Wn. App. 419, 425, 309 P.3d 620 (2013). "Because of the parents' fundamental constitutional rights at stake in termination hearings, due process requires that parents have the ability to present all relevant evidence for the juvenile court to consider prior to terminating a parent's rights." *R.H.,* 176 Wn. App. at 425-26 (citing *In re Welfare of Shantay C.J.,* 121 Wn. App. 926, 940, 91 P.3d 909 (2004)). Similarly, parents have the substantive due process right to pursue statutory alternatives to involuntary termination when the statutory alternatives are available as viable options. *See R.H.,* 176

Wn. App. at 428-29 (because guardianship was in progress and was a viable alternative to termination of parental rights, the trial court improperly denied a motion to continue to allow father to present evidence regarding the guardianship). One statutorily created alternative to involuntary termination is voluntary relinquishment of parental rights. Accordingly, substantive due process requires that parents be permitted the opportunity to pursue voluntary relinquishment prior to the involuntary termination of their parental rights if voluntary relinquishment is available as a viable alternative.

¶21 Here, C.Q. may have wanted to voluntarily relinquish his parental rights so that he could enter an open-communication adoption agreement and maintain his relationship with H.Q. However, the juvenile court summarily dismissed this request based on Jorgensen's representation regarding C.Q.'s competency. Because due process requires that C.Q. have the opportunity to pursue voluntary relinquishment as an alternative to involuntary termination, the juvenile court erred by dismissing C.Q.'s inquiry regarding voluntary relinquishment without holding a hearing to determine whether C.Q. was competent to voluntarily relinquish his rights.

C.   WAIVER OF A FUNDAMENTAL RIGHT

¶22 Instead of following the statutory procedure for relinquishing parental rights under chapter 26.33 RCW, C.Q.'s attorney conceded that C.Q. was not competent to relinquish his parental rights and that Peck, his guardian, wished to sign a voluntary relinquishment order on C.Q.'s behalf. Because relinquishing parental rights is a fundamental liberty interest, the juvenile court violated C.Q.'s right to due process when it accepted Jorgensen's waiver of C.Q.'s competence to voluntarily relinquish his parental rights to H.Q. without holding a hearing or determining whether C.Q. authorized Jorgensen to concede his incompetence.

¶23 In general, the statutes pertaining to adoption permit a parent involved in a dependency action to elect to relinquish his or her parental rights. A parent who does this may then enter into an open-communication adoption agreement to preserve some contact with the child. RCW 26.33.295. This is, in fact, what occurred with H.Q.'s mother.

¶24 Simply because a party has an appointed guardian or GAL, *see* RCW 4.08.060, however, does not preclude the party from seeking to voluntarily relinquish his parental rights. In fact, RCW 26.33.070 expressly permits incompetent persons to seek appointment of a guardian or a GAL in an adoption proceeding. Once appointed a guardian, the incompetent person may nevertheless voluntarily relinquish his parental rights after the guardian "make[s] an *investigation and report* to the court concerning whether any written consent to adoption or petition for relinquishment signed by the parent . . . was signed *voluntarily* and *with an understanding of the consequences* of the action." RCW 26.33.070(1) (emphasis added). This statute applies to parents of dependent children under chapter 13.34 RCW and permits the court to "rely on the minor parent's dependency court attorney or guardian ad litem to make a report to the court." RCW 26.33.070(1).

¶25 Although an attorney is impliedly authorized to enter into stipulations and waivers concerning procedural matters to facilitate a hearing, an attorney may not waive her client's substantial rights.[10] *See In re Welfare of Houts*, 7 Wn. App. 476, 481, 499 P.2d 1276 (1972); *see also Russell v. Maas*, 166 Wn. App. 885, 890, 272 P.3d 273 (2012); *Graves v. P.J. Taggares Co.*, 94 Wn.2d 298, 303, 616 P.2d 1223 (1980). Instead, the client must specifically authorize waiver of a substantial right. *Graves*, 94 Wn.2d at 303 (quoting *Houts*, 7 Wn. App. at 481).

---

[10] Nor may a GAL waive a client's substantial right. *In re Quesnell*, 83 Wn.2d 224, 238-39, 517 P.2d 568 (1973) (quoting *In re Welfare of Houts*, 7 Wn. App. 476, 481, 499 P.2d 1276 (1972)).

¶26 Here, Jorgensen conceded C.Q.'s incompetence to voluntarily relinquish his parental rights. The juvenile court found that "[t]he father is *apparently* not capable of voluntarily relinquishing his parental rights" without holding a hearing on C.Q.'s competence or determining whether C.Q. authorized the waiver. CP at 72 (emphasis added). The record reflects that C.Q. may have wanted to relinquish his rights so that he could seek an open-communication adoption agreement. At an earlier hearing, C.Q. had been allowed to consent to a dependency fact finding, a waiver that opened the door to a dispositional order that would limit his parental rights and impose significant obligations on him to comply with a service plan. Instead of inquiring whether C.Q. in fact could also make the important but apparently less complex decision to relinquish his rights, the juvenile court and C.Q.'s attorney made the decision for him, depriving C.Q. of his due process right to pursue voluntary relinquishment as an alternative to involuntary termination. We vacate the involuntary termination of C.Q.'s parental rights and remand for the juvenile court to hold a hearing on C.Q.'s competence to voluntarily relinquish his parental rights under the standard in RCW 26.33.070(1).

¶27 All the parties agree that it would be in the best interests of both H.Q. and C.Q. to maintain the parent and child relationship. We note that legislature recently amended chapter 13.36 RCW in 2010 to create guardianships that establish permanency for dependent children while at the same time preventing the termination of parental rights. *See* RCW 13.36.010 ("The legislature finds that a guardianship is an appropriate permanent plan for a child who has been found to be dependent under chapter 13.34 RCW and who cannot safely be reunified with his or her parents. . . . The legislature intends to create a separate guardianship chapter to establish permanency for children in foster care through the appointment of a guardian and dismissal of the dependency."). If the juvenile court finds C.Q. competent to

voluntarily relinquish his parental rights, then the guardian will have the authority to pursue voluntary relinquishment as an alternative to involuntary termination. In the event that the competency hearing results in a finding that the father is not competent to voluntarily relinquish his parental rights, the parties may explore alternatives to establishing permanency for the child while still safeguarding the important familial bond H.Q. and C.Q. share.

¶28 We vacate the termination of C.Q.'s parental rights and remand for the juvenile court to hold a hearing on C.Q.'s competence to voluntarily relinquish his parental rights and for further additional proceedings consistent with this opinion.

Maxa and Lee, JJ., concur.