IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Termination of: | ) | No. 31630-1-III |
| | ) | (consolidated with |
| A.D.R. and | ) | No. 31631-9-III) |
| A.K.D.R. | ) | |
| | ) | PUBLISHED OPINION |
| | ) | |

SIDDOWAY, C.J. — In a series of decisions, our courts have held that a trial court abuses its discretion if, in refusing a parent's request to continue a parental rights termination trial, it prejudicially denies a parent's fundamental liberty interest in the relationship with his or her child. In this case, Montez Minor asks us to find that the trial court abused its discretion when it denied his request to continue trial so that he could pursue the possibility of an open adoption of his two daughters.

Mr. Minor's request for a continuance is distinguishable from the cases on which he relies. The prospect of an open adoption that he raised at the outset of trial was both irrelevant and too speculative to be admitted as evidence at the trial. And the court's denial of the motion caused no immediate or irremediable prejudice, since Mr. Minor remained able to act on the last minute possibility for adoption. Under these

circumstances, the trial court's discretion to grant or deny the continuance was not constrained, and no abuse of discretion is shown. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Montez Minor is the father of two girls, A.D.R. and A.K.D.R., who were ages six and two at the time of the trial below. The Department of Health and Human Services (Department) placed A.D.R. in foster care in September 2010 due to concerns over her mother's mental health. A.K.D.R. was born shortly thereafter and was placed in the same foster home as her sister. Mr. Minor was living in Seattle at the time, while the girls' mother lived in Ellensburg.

From the time A.D.R. was placed into foster care, the Department attempted to locate Mr. Minor. The only information the mother gave social worker Maura Brown about his whereabouts was that he lived on the west side of Washington State. It turned out that Mr. Minor, who had been unable to find steady employment since moving to Seattle from Georgia, was living in a church's homeless shelter.

In April 2011, Ms. Brown was able to find a phone number for Mr. Minor's mother, who lived in Indiana. Mr. Minor's mother refused to provide Ms. Brown with information about her son's whereabouts but evidently did inform Mr. Minor of the call, because Mr. Minor called Ms. Brown the next day. A month later, when Mr. Minor visited the girl's mother, Ms. Brown was able to travel to the home and meet with him.

2

During their first meeting, Ms. Brown and Mr. Minor discussed services the Department could offer. She made referrals to services based on their discussions.

Ms. Brown referred Mr. Minor to Dr. Robin LaDue for a parenting evaluation, and Mr. Minor participated in a psychological evaluation with a parenting component on October 26 and December 5, 2012. He did not return to complete the evaluation. Dr. LaDue completed a report on December 17 based on her two opportunities to interview Mr. Minor and observe him with his daughters.

Ms. Brown referred Mr. Minor to Associated Behavioral Health, which is located in Seattle, for a domestic violence (DV) assessment. Mr. Minor completed the domestic violence assessment on December 27, the result of which was a recommendation that he participate in a one-year domestic violence intervention program in a state-certified DV facility. While several Seattle-based DV treatment providers were identified to Mr. Minor, he refused the referral, saying he needed time to think about it. Mr. Minor never enrolled in the recommended intervention program.

Ms. Brown identified Seattle-based parenting classes offered by Catholic Family Services. Mr. Minor was unwilling to participate in parenting classes.

Ms. Brown provided Mr. Minor with bus vouchers so that he could travel from Seattle to Ellensburg to visit the children. He accepted several bus vouchers. Between May 2011 and February 2013, he visited his daughters seven times. He developed a limited relationship with A.D.R. and no relationship with A.K.D.R.

3

Because Mr. Minor failed to engage in all of the court-ordered services, continued to have parental deficiencies, and failed to establish and maintain a relationship with his daughters, the Department filed a petition to terminate his parental rights in September 2012. Trial was initially scheduled for January 23, 2013 but was continued several weeks, to February 14. Mr. Minor appeared for the trial with his court-appointed lawyer. The mother, whose parental rights were also at issue, appeared with her court-appointed lawyer but requested and was given permission to proceed pro se.

At the outset of trial, Mr. Minor's lawyer requested a continuance. Because the verbatim report of proceedings included a seriously deficient record of what was said during argument of the continuance motion, we directed the parties to prepare an agreed or court-settled narrative report of the inaudible portions of the record.

We reproduce portions of the verbatim report of argument of the continuance motion, alongside the parties' agreed narrative report. Cathy Busha, who represented Mr. Minor, speaks, as does Marty Dixon, who represented the Department:

| VERBATIM REPORT OF PROCEEDINGS | AGREED NARRATIVE |
| --- | --- |
| THE COURT: . . . Ms. [Busha], any issues that we should talk about before we get started here? | |
| . . . . | |
| MS. [BUSHA]: "Your Honor, Mr. Minor and I have had several conversations. And if I could just (inaudible)." | *Ms. Busha was asking the court for a further opportunity to speak.* |

4

Nos. 31630-1-III; 31631-9-III
*In re Termination of A.D.R. and A.K.D.R.*

THE COURT: Absolutely.

MS. [BUSHA]: Um, we have talked a lot about (unintelligible) . . . As you can imagine, Mr. Minor (unintelligible), however, we just received word that the open adoption (inaudible) by the foster parents. Um, which is unusual but it's a different opportunity for my client. My client has just let me know this last night and we discussed it this morning, um (unintelligible) so we're just in a really difficult position, um so . . .

*Ms. Busha was alerting the court that she had received last minute information about an open adoption agreement that was different from the prior offer and she had not had sufficient time to discuss it with Mr. Minor.*

THE COURT: Okay, I appreciate you sharing that with us. Thank you. All right. Well, the Court will state that lawsuits, court cases, they sometimes are very hard because usually it's important stuff that we're talking about here in the courtroom. People disagree sometimes about what shouldn't happen in the future and that's okay, you know. You have two people, you're likely to have disagreement about something. Very rarely everybody sees the world the same on every issue. (Inaudible) disagree. So, the courtroom is a place where we can have those disagreements brought forward and argument can be made . . . facts developed to establish a person's desire to try to have their wants met by the Court. The Court will take all the evidence and rule. I don't know what that's going to look like right now because I haven't seen the evidence. I don't know what's going to happen. So we do need to get our trial started and, Mr. Dixon, you're the moving party here.

MR. DIXON: Yes, Your Honor, I'll waive opening (unintelligible) and we'll call Mr. Minor to the stand.

THE COURT: All right.

5

MS. [BUSHA]: Your Honor, I didn't finish (inaudible) . . .

*Ms. Busha was explaining that she did not finish speaking.*

THE COURT: Oh, okay.

MS. [BUSHA]: My client has asked if, for his portion of the trial, in lieu of the fact if we give this information, um, if (inaudible). I did not tell Mr. Dixon about this. This is totally (inaudible) . . . but this is what me [sic] client is bringing up and I (inaudible).

*Ms. Busha was explaining that she received last minute information that she had not had a chance to talk about with Mr. Dixon, the assistant attorney general. Her client wanted time to discuss the open adoption proposal before the trial and wanted to delay his trial.*

THE COURT: Can you tell me Ms. [Busha,] Mr. Minor's request is why?

MS. [BUSHA]: The reason why is because we have (inaudible) to talk about the possibility of relinquishing any open adoption. Prior to this, the open adoption only for the (unintelligible) and photograph. Urn, the foster parents have agreed (unintelligible) after Felix went to them that they would leave a description (unintelligible).

*Ms. Busha was telling the court that the reason she wanted more time was because this was a new possibility of relinquishing parental rights in favor of an open adoption agreement that Mr. Minor was interested in discussing. This offer would include more than photographs and one letter per year, which was the prior open adoption offer. This new offer would allow some visits at the discretion of the foster parents.*

THE COURT: Is it their discretion?

MS [BUSHA]: Their discretion which makes it more (unintelligible) for my client and he hasn't really had a lot of time to think about it and hates to pressure (inaudible) at the end of the trial so

*Ms. Busha was further explaining to the court that the new offer would allow some visits at the potential adoptive parent's discretion. She had let*

6

I've let him know that once your parental rights are terminated that's (unintelligible) in terms of the ability to have a relationship with the children. So that's the request. That's why we entered the request. And I do apologize to the Court . . .

*Mr. Minor know that if the trial proceeded and his rights were terminated, he would not have the ability to have any continued relationship with his children. She was apologizing to the Court because she had just learned this information and had not had enough time to discuss it with Mr. Minor.*

THE COURT: No, no, that's (unintelligible) okay
. . .

MS. [BUSHA]: Also to the attorney general who's been diligently making (unintelligible) efforts to try to resolve this case.

*Ms. Busha was also apologizing to the attorney general for this last minute request for additional time.*

THE COURT: Okay. Mr. Dixon, you've heard the motion for a continuance . . .

Agreed Narrative Report of Proceedings (July 14, 2013) at

5-7.

At this point, the verbatim report of proceedings becomes more complete. Mr. Dixon pointed out that the trial had been continued several weeks already, that the children had been out of the parent's home for a long time, that Mr. Minor's participation would be needed in the Department's case against the mother even if the case against Mr. Minor was continued, and "[a]t this point we'd like to go forward." Clerk's Papers (CP) at 8. He added that "[i]f something comes to fruition during this case, then things could change." *Id.*

7

The trial court also heard from the guardian ad litem, who opposed a continuance, and the children's mother, who was neutral, but did point out that she lived in Georgia and "it did take two and a half days to get here." *Id.* After hearing from all parties, the court ruled:

> THE COURT: Okay. Well .... This is the first time the case has been re-set. We have to have the ability to get these cases done. Everybody's here right now. The witnesses are all here right now, today and tomorrow and it has an adequate time for everyone to come prepared for this trial so there's no reason, ah, . . . I don't think that the reason that's been proposed requires me to continue this overcomes the . . . for me to (inaudible). We'll go ahead and deny the motion for continuance and do the trial today and tomorrow (inaudible).

CP at 9.

The parties proceeded with a two-day trial, at the conclusion of which the trial court took the matter under advisement.

Six days after completion of the trial, the court sent its letter ruling to the parties. It found that the Department had met its burden of proving the elements required to terminate both parents' rights. On March 28, it entered findings of fact and conclusions of law and an order terminating the parental rights of both parents in both children. Mr. Minor timely appealed.

In April 2014, we requested supplemental briefing addressing *In re Welfare of H.Q.*, 182 Wn. App. 541, 330 P.3d 195 (2014), which had been called to our attention by

Mr. Minor. In May 2014, we directed the parties to provide the agreed narrative report of proceedings.

## ANALYSIS

Mr. Minor does not assign error to the court's findings of fact or conclusions of law. He essentially concedes that the Department proved the elements it was required to prove to terminate his parental rights. He instead assigns error to the trial court's refusal to continue the trial so that he could further consider and possibly pursue an open adoption.

In both criminal and civil cases, a trial court's decision to grant or deny a continuance is ordinarily reviewed for a manifest abuse of discretion. *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004). Discretion is abused only where no reasonable person would take the view adopted by the trial court. *State v. Sutherland*, 3 Wn. App. 20, 21, 472 P.2d 584 (1970). In deciding a motion to continue, the trial court takes into account a number of factors, including diligence, due process, the need for an orderly procedure, the possible effect on the trial, and any prior continuances. *In re Dependency of V.R.R.*, 134 Wn. App. 573, 581, 141 P.3d 85 (2006).

Mr. Minor argues that the trial court's refusal to grant Mr. Minor an adequate opportunity to consider and negotiate an open adoption violated his right to due process, in light of his fundamental liberty interest in a relationship with his children.

9

Alternatively, he argues that the court's refusal to continue the trial denied him his right to the meaningful assistance of counsel.

In a series of three decisions, our courts have addressed circumstances in which courts abused their discretion by refusing to continue trial of a petition terminating parental rights. We first review those decisions and then turn to Mr. Minor's complaints of denial of due process and ineffective assistance of counsel.

*I. In re V.R.R., Welfare of R.H., and Welfare of H.Q.*

In *In re V.R.R.*, the Department filed a petition to terminate Amos Ramsey's parental rights to his two minor children. James Nelson had been appointed as Mr. Ramsey's lawyer in the dependency proceeding, which was uncontested. A year and nine months after the agreed order of dependency was entered, the Department filed a petition to terminate Mr. Ramsey's parental rights. Although a notice to appear at a hearing informed Mr. Ramsey of the right to seek appointed counsel and court minutes of a hearing in the termination proceeding indicated that Mr. Ramsey needed a lawyer, none was appointed until the day before the trial. At that time, Mr. Nelson was again appointed to represent Mr. Ramsey. The reason for the delay in the appointment was not clear.

Mr. Nelson appeared at the time for trial, told the court he was unprepared to proceed, and asked for a continuance. The Department, noting Mr. Ramsey's failure to appear, asked for a default. The trial court attributed the delay in Mr. Nelson's

10

appointment to Mr. Ramsey,[1] chose to proceed, and following the trial, terminated Mr. Ramsey's parental rights.

On appeal, Division One of our court began its analysis by recognizing that "[p]arents have a fundamental liberty interest in the care and custody of their children, that is protected by the Fourteenth Amendment and article I, section 3 of the Washington State Constitution." *In re V.R.R.*, 134 Wn. App. at 581 (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Welfare of Myrick*, 85 Wn.2d 252, 533 P.2d 841 (1975)). It recognized that "[t]he State also has a compelling interest in protecting the physical, mental, and emotional health of the children." *Id.* (citing *Myrick*). While acknowledging that a trial court's decision on a request for a trial continuance is ordinarily reviewed for manifest abuse of discretion, the court noted that "[w]hen denial of a motion to continue allegedly violates constitutional due process rights, the appellant must show either prejudice by the denial or the result of the trial

---

[1] The appellate opinion includes the trial court's oral ruling:
I see no reason why we can't go ahead this morning. Your client has had notice of this matter for months. He's not here. And he just got his attorney on board last night. That is not the approach of somebody who is particularly interested in this case or his children . . . the limitations that you're suffering are entirely the responsibility of your client and not the responsibility of the Department or this court.

*In re V.R.R.*, 134 Wn. App. at 579 n.2.

would likely have been different if the continuance was granted. *Id.* (citing *State v. Tatum*, 74 Wn. App. 81, 86, 871 P.2d 1123 (1994)).

The appellate court rejected the Department's argument that Mr. Ramsey had forfeited his right to legal representation by being dilatory in securing appointment of a lawyer. Observing that "a party must engage in extremely severe and dilatory conduct to establish forfeiture" of counsel, the court pointed out that the record did not support the conclusion that the delay in Mr. Nelson's appointment was the result of extremely dilatory conduct on Mr. Ramsey's part. *Id.* at 582 (citing *City of Tacoma v. Bishop*, 82 Wn. App. 850, 856, 920 P.2d 214 (1996)).

The court also rejected the Department's argument that because Mr. Nelson had represented Mr. Ramsey in the dependency and was somewhat familiar with the matter, Mr. Ramsey had not demonstrated ineffective assistance. It pointed out that Mr. Nelson

> received no discovery, had no opportunity to review the documents identified by [the Department] in the Notice of Intent to Admit, and had no opportunity to interview the witnesses identified by [the Department] or to obtain an independent evaluation of Ramsey.

*Id.* at 585. It concluded that "[u]nder either the fair hearing standard in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), or the meaningful hearing standard in *In re Moseley*, 34 Wn. App. 179, 660 P.2d 315 (1983), Mr. Nelson could not provide effective assistance of counsel without additional time to prepare." *Id.* at 586. Under the circumstances, it concluded that the trial court's decision to deny the

12

motion to continue deprived Mr. Ramsey of the right to effective assistance of counsel and was an abuse of discretion.

In a second case, *In re Welfare of R.H.*, 176 Wn. App. 419, 309 P.3d 620 (2013), Bobby Adolphus moved the trial court to either continue trial of the Department's petition to terminate his parental rights to his three minor children or require the Department to expedite its consideration of a guardianship placement with the children's aunt. The Department had filed its petition to terminate Mr. Adolphus's parental rights in October 2011. The children's aunt came forward as a potential guardian in January 2012. When it appeared that the Department's completion of a required home study of the aunt might not be completed in time for the May, 3, 2012 trial, Mr. Alophus filed his motion for a continuance or expedited home study on April 5. The motion was heard on April 18. The trial court denied the motion, accepting the Department's argument that whether the children would be placed with their aunt was immaterial to whether the State could prove the required elements at the termination trial.

The appellate court disagreed, and held that "an *identified* guardianship is material" to a determination whether the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home, an element the Department is required to prove under RCW 13.34.180(1)(f). 176 Wn. App. at 423 (emphasis added). It added that because a parent's fundamental constitutional right is at stake, "due process requires that parents have the ability to

13

present all relevant evidence for the juvenile court to consider prior to terminating a

parent's rights." *Id.* at 426 (citing *In re Welfare of Shatay C.J.*, 121 Wn. App. 926, 940,

91 P.3d 909 (2004). "Here," the court said,

> the potential for a guardianship placement had been established for four
> months prior to the termination trial and the State had completed the
> necessary background check and was in the process of approving the aunt
> for guardianship placement. At the termination hearing, [the Department]
> expressed optimism about being able to permanently place the children
> with the aunt. The juvenile court should have considered the availability of
> guardianship placement with the aunt when determining whether the State
> had met its burden to prove RCW 13.34.180(1)(f).

*Id.* at 429. As a result, it concluded, "the juvenile court abused its discretion by denying

Adolphus's timely motion to continue the trial." *Id.*

In a third case, *In re Welfare of H.Q.*, 182 Wn. App. 541, 330 P.3d 195 (2014), the

trial court was not presented with a motion for continuance, but instead faced an unusual

pretrial dispute. The guardians of a developmentally disabled father, whose legal

competence was questionable, wished to voluntarily relinquish parental rights to his

daughter, H.Q., so that he could enter into an open-communication adoption agreement

with her adoptive parents. But the Department took the position neither the disabled

father nor his guardians had the capacity to voluntarily relinquish his parental rights.

According to the Department, the only option was to pursue involuntary termination of

the father's rights. Rather than resolve the dispute, the juvenile court simply proceeded

14

with the termination trial, at the conclusion of which it found that the Department had met its burden of proof and terminated the father's rights.

On appeal, the court held that "a parent has a substantive due process right to pursue voluntary relinquishment of his or her parental rights as an alternative to involuntary termination," and that "[t]he juvenile court should have held a hearing to determine [the father's] competence to relinquish his parental rights before involuntarily terminating his parental rights to H.Q." *Id.* at 449-550. It vacated the termination of the father's parental rights and remanded for the juvenile court to hold a hearing on the father's competence to voluntarily relinquish his parental rights or, if he was found incompetent, to "explore alternatives to establishing permanency for the child while still safeguarding the important familial bond H.Q. and [her father] share." *Id.* at 556.

While the decision speaks broadly of a parent's "substantive due process right to pursue statutory alternatives to involuntary termination when the statutory alternatives are available as viable options," *id.* at 552-53 (citing *R.H.*, 176 Wn. App. at 428-29), it does so in the context of an open-adoption alternative that had been explored and pursued by the father's guardians as far as possible until running headlong into the Department's opposition.

With that background, we turn to Mr. Minor's arguments on appeal.

15

## II. Due process

Mr. Minor first compares his request for a continuance to the motion whose denial was found to be an abuse of discretion in *R.H.* But both the facts presented and the law at issue in *R.H.* are distinguishable. In *R.H.*, Mr. Adolphus made what the appellate court characterized as a timely motion to more fully develop evidence of an identified guardianship that the court found was material to one of the elements the State was required to prove: namely, whether the "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f). The appellate court concluded that an identified guardianship that had been under review for four months and that the State's witnesses conceded looked promising was relevant, and that the Department's home study should be completed before the Department's petition was tried.

In this case, Mr. Minor was not offering the adoption option as evidence. He conceded at trial that he was not in a position to care for his children due to his lack of housing and employment. It was apparent that Mr. Minor simply wanted more time to consider the option as an alternative to contesting the termination of his rights. The reasons for the holding in *R.H.* have no application.

More apt, but equally unavailing, is Mr. Minor's reliance on *Welfare of H.Q.* As in this case, the basis for deferring the termination trial in *H.Q.* was not to develop evidence but instead to pursue an option on the father's behalf. But unlike this case, there

16

was nothing new or speculative about the intentions of the guardians of the developmentally disabled father in *H.Q.*—they had clearly decided that relinquishment of parental rights was the course of action they wished to pursue. They had simply run into a roadblock with the Department, given its disagreement as to their, or their ward's, legal capacity. What the guardians and their ward needed in *H.Q.* was not more time for reflection, but a court's resolution as to how they could accomplish a relinquishment of rights they had concluded was in their client's best interest.

Mr. Minor, by contrast, had not run into any roadblock; there had simply been a new development in his settlement options. Unlike in *H.Q.*, nothing prevented him from continuing to try to resolve open adoption terms. The Department's lawyer even stated in responding to the continuance motion that if "something comes to fruition," the Department's position could change. CP at 8. Without a continuance, Mr. Minor could still try to pursue negotiations during trial recesses, or at the end of the trial day. He could have asked the court to recess early, so the parties and the adoptive parents could confer. He could have asked the court to take the termination issue under advisement (which the court ultimately did), thereby giving him time to explore alternatives. He could have pursued discussions in the six days following the trial and before the court dispatched its letter ruling. Given all of these alternatives, Mr. Minor cannot demonstrate prejudice or that the result of the trial would likely have been different.

17

The trial court properly considered the Department's and guardian ad litem's concerns about the length of time the children had been out of the home and the convenience of other parties and witnesses. No abuse of discretion is shown.

### *III. Ineffective assistance of counsel*

Alternatively, Mr. Minor contends that the trial court's denial of his motion for a continuance denied him the meaningful assistance of counsel. Unlike in *V.R.R.*, he presents literally no showing that Ms. Busha was not prepared to represent him in the termination proceeding.

Instead, he argues that the scope of the right to counsel in a termination proceeding includes not only preparation and participation at trial but also negotiating toward a settlement on a client's behalf, likening his lawyer's obligation to a criminal defense lawyer's obligation to promptly convey and counsel a client concerning a plea offer. Br. of Appellant at 9 (citing *Missouri v. Frye*, __ U.S. __, 132 S. Ct. 1399, 1407, 182 L. Ed. 2d 379 (2012)). He contends that his right to representation *in pursuing settlement* was denied by the court.

We agree that Ms. Busha had a duty to counsel Mr. Minor about an open adoption alternative and participate as appropriate in communicating settlement offers and responses. But it does not follow from his right to such representation that the trial court was required to suspend trial so that settlement counseling and communication could take place instead. It is the rare case in which a court will call off trial so that parties can try

18

to achieve a settlement that has so far proved elusive. The more prevalent view is that holding parties to a trial schedule facilitates settlement.

Because it is the norm that a party presented with an eve of trial settlement proposal is required to deal with it as trial proceeds, Mr. Minor shows no prejudice. Here again, he shows no prospect of a change in the trial result and no abuse of discretion.

Affirmed.

_____
Siddoway, C.J.

WE CONCUR:

_____
Brown, J.

_____
Korsmo, J.