# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of | No. 77281-3-I/Consolidated w/ No. 77282-1-I |
| X.C.S.-H., DOB: 04/20/2012, | |
| L.J.S., DOB: 09/04/2008, | DIVISION ONE |
| Minors, | |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| AMY SWEET, | |
| Appellant. | FILED: April 30, 2018 |

SPEARMAN, J. — Amy Sweet appeals from the order terminating her parental rights to her two sons, X.C.S.-H. and L.J.S. She contends that the court failed to prove that there was little likelihood that parental deficiencies would be remedied in the near future, that continuation of the parent-child relationship diminished the boys' prospects for integration into a stable and permanent home, and that termination was in the best interests of the children. Substantial evidence supports these findings. We affirm.

FACTS

Amy Sweet is the biological mother of two boys.[1] L.J.S was born on September 4, 2008, and X.C.S.-H. was born on April 20, 2012. On February 2. 2015, after Sweet's arrest on a third degree assault charge, the children were placed in protective custody. Soon thereafter, on February 4, the Department of Social & Health Services (Department) filed a dependency petition and placed the boys in foster care with family friends. At the time, the boys were two and a half and six and a half years old. In March 2015, Sweet entered into an agreed order of dependency. As part of the acknowledged issues related to alcohol and to her mental health, she agreed that the services ordered to address the issues were necessary and appropriate. In the disposition order, Sweet agreed to participate in a substance abuse evaluation, to follow any resulting recommendations, submit to random urinalysis, to participate in a mental health assessment, to follow any resulting recommendations and to participate in counseling.

Throughout the dependency, the Department offered and provided the mother with appropriate services, including substance abuse evaluation and treatment,[2] random urinalysis tests, mental health assessment and counseling, parenting instruction, Family Drug Treatment Court, Moral Reconation Therapy, Therapeutic Alternatives Program, a domestic violence assessment and

---

[1] Sweet also has a daughter, Leigha, who was 18 years old at the time of trial and not subject to the proceeding.

[2] Sweet attempted drug and alcohol treatment prior to this dependency in 2009 or 2010, and again in 2013. She did not stop using drugs or alcohol after these treatment attempts.

treatment, medication management, a psychological evaluation with a parenting component, and a Foster Care Assessment Program assessment.

Sweet entered into and completed inpatient drug and alcohol treatment in May 2015. At the time she began the program, she was using alcohol, cocaine, and marijuana. After completing the program, she relapsed throughout the summer. But Sweet continued with intensive outpatient treatment and graduated from Family Drug Treatment Court in June 2016. The Department stopped asking Sweet for urinalysis testing in December 2016.

Also in December 2016, the Department filed termination petitions for both X.C.S.-H. and L.J.S. In April 2017, Sweet requested that the court return the boys to her or grant unsupervised visits, declaring that she had been clean and sober for 618 days. But the Department received a report that Sweet was using and referred for urinalysis testing. Sweet admitted that she had been using marijuana since February 2017. She tested positive for marijuana and cocaine. Her motion for a return home or unsupervised visits was denied, and the Department referred her for additional evaluation and treatment.

Sweet's sons were eight and a half and five years old, respectively, at the time of Sweet's termination hearing in June 2017. They had been out of the home for 29 months. At trial, Sweet's various social workers, case managers, and the guardian ad litem testified about her strengths and deficits as a parent, which included her mental health, parenting skills, substance abuse, and choice of romantic partner.

Sweet reported having anxiety and depression. Sweet's depression raised concerns about her parenting. After evaluating her, forensic psychologist, Dr. Evan Freedman testified that

> some of the withdrawal and lack of engagement that I observed in the parent-child visit would relate to either depression or a sense of hopelessness, a lack of confidence, and so that -- there's a connection there between the information on the [Minnesota Multiphasic Personality Inventory] and the actual behavior that we observe when she's parenting. . . . depression can have a negative impact on parenting.

Verbatim Report of Proceedings (VRP) at 227-28. Sweet's court-appointed diversion case manager, Christine Lee, recommended that she see a therapist once a week. But Sweet attended therapy appointments far less frequently. In the four months leading up to trial, Sweet attended therapy between three and six times. At another point in the dependency, Sweet went two or three months without attending therapy. These periods of inconsistent attendance were usually due to a change in mental health provider. A psychiatrist recommended that Sweet take medication for her mental health condition, but Sweet discontinued use after trying it.

Witnesses also testified that Sweet had been unable to make progress expanding her visits with the boys. Throughout the dependency, Sweet had regular, monitored visits with them. At the time of trial, Sweet had a two hour visit with X.C.S.-H. on Tuesday, a two hour visit with L.J.S. on Thursday, and a two hour visit with both boys on Friday. At one point, the Department attempted to expand Sweet's visits. But Sweet missed these visits, so the monitored visit contract was cancelled. While Sweet did graduate from supervised visits to

4

monitored visits, she never successfully moved to unsupervised visits, or to expanding times for monitored visits.

Those who observed Sweet with her boys testified that she loved her children and was bonded to them, and likewise her boys loved and were attached to her. But they also noted concerns about Sweet's parenting skills. Social worker Denise Hollenbeck testified that she observed X.C.S.-H. nearly put a marble up his nostril during a visit with Sweet. When Hollenbeck took the marble from the child and gave it to Sweet, she did not place the marbles out of reach. In addition, Sweet was told about concerns that a bookshelf on top of a desk was a tipping hazard. But Sweet did not promptly move the bookshelf or secure it to the wall. Hollenbeck also criticized Sweet for feeding her children and watching shows or movies with them when she should have been helping with homework or more actively engaged with them. Hollenbeck criticized Sweet for not insisting that her boys stay in timeout, and being inconsistent with them. She testified about another incident in which Sweet took her boys to do laundry in another building. When returning to the apartment, X.C.S.-H. did not follow Sweet inside, and was left outside the apartment with Hollenbeck for a few minutes.

These observations of Sweet's parenting skills were of particular concern because X.C.S.-H. has special needs arising from his global developmental delays and low cognitive functioning. Dr. Freedman testified that "the task of parenting these children is going to be very difficult. So there's a mismatch there between the level of difficulty the children present and the level of skill and

5

capacity that Ms. Sweet has." VRP at 224. And in spite of invitations to medical and school appointments, Sweet had attended only one medical and one school appointment.

Sweet's living situation was also a concern. She continued to live with her fiancé even though the Department advised her that it could not approve the children living with him due to his recent domestic violence criminal history. In spite of the Department's warnings, Sweet did not take action to move her fiancé out of her home. In addition, Sweet's daughter lived in her home, which concerned witnesses. The two had a volatile relationship and the daughter used drugs in the home.

The Department's witnesses testified that, while continued contact with Sweet would be ideal, termination of her parental rights was in the boys' best interests. Hollenbeck testified that she saw a lot of progress with the boys after they were placed in foster care:

> When I first met [X.C.S.-H.], the caregivers told me that he had – came to them with about 15 words. And at that point, he acted out angrily or he acted out a lot because he…seemed unable to use words. . . .
> Over the course of [the] next year and a half, he became much more verbal. . . .
> He learned to not fight so much with his brother and sister and not grab toys, and, you know, just do a variety of things that he seemed not to be able to do when he arrived at the home.

VPR at 112. With respect to the older brother, [L.J.S.], "he seemed to be able to kind of come out of [his] shell." VRP at 113.

Evaluator Beverley Pearl also recommended termination, testifying that in foster care the boys

were both progressing in school, they were doing better behaviorally and emotionally. I think that there had been quite a turnaround in behaviors...[W]hen [X.C.S.-H.] was placed at 34 months, he wasn't walking, and he wasn't really talking, and he wasn't potty trained. He was just under three years old. And he immediately started making really significant progress in all of those areas.

VRP at 312-13. She also recommended termination.

The trial court entered findings and an order terminating Sweet's parental rights to the children. Sweet appeals.

## DISCUSSION

Parental rights are a fundamental liberty interest protected by the United States Constitution. <u>Santosky v. Kramer</u>, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1)(a-f). If the State satisfies these criteria, the court may terminate parental rights if it finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(b).

On review, unchallenged findings of fact are considered verities. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing ..." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Because the trial court hears the testimony and observes the witnesses, its decision is entitled to deference. In re Dependency of A.V.D., 62 Wn. App. 562, 568, 815 P.2d 277 (1991). Consequently, we defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. Id.

Likelihood That Conditions Will Be Remedied in the Near Future

Sweet argues that the Department failed to prove that her children could not be returned to her in the near future as required by RCW 13.34.180(1)(e). She contends that she was actively engaged in services at the time of trial, and required merely eight weeks to complete relapse prevention, remove her fiancé from her home, and complete her parenting classes.

The State points out that the mother failed to assign error to the finding that "[t]here is little likelihood that conditions will be remedied so that the children can be returned to the mother in the near future." Findings of Fact (FF) 2.30; CP at 12. Unchallenged findings of fact are verities on appeal, and this finding

8

supports that the boys could not be returned to Sweet in the near future. But even if Sweet had challenged this finding, substantial evidence supports that the Department met its burden to prove that there is little likelihood that conditions will be remedied so that the children can be returned to the parent in the near future.

Sweet continued to have significant parental deficiencies in spite of the many services that she participated in, making her unable to successfully expand visits with her children. She also continued to struggle with substance abuse, which diminished her ability to parent effectively. After relapsing in February 2017, urinalysis testing demonstrated that her marijuana levels were not decreasing. While Sweet acknowledged that she "shouldn't be using any kind of drugs or alcohol ... [b]ecause I make bad decisions," she also minimized her use of marijuana due to it being a legal substance, and testified that she believed her boys should live with her even if she used marijuana. VRP at 67-68.

Sweet's living situation is additional evidence that conditions would not be remedied in the near future to enable the boys to return home. The Department repeatedly warned the mother that it could not approve of reunification if the mother's fiancé was living with her due to his history as a domestic violence perpetrator. At trial, Sweet first denied that she remembered such a warning. Later, she acknowledged that she knew that her continued cohabitation was a barrier to reunification with her kids. There is no evidence in the record that Sweet was willing to remove her fiancé from her home in response to these concerns. While Sweet argues that her fiancé offered to move out of the home,

9

Hollenbeck testified that it was not a "real genuine offer to move out" because he was "sort of having a tantrum" at the time. VRP at 163.

Sweet argues that her enrollment in a relapse awareness program demonstrates her ability to correct her substance abuse problems in the near future. But as the trial court found, Sweet had already experienced extensive treatment for substance abuse, which included relapse awareness. Substantial evidence supports the trial court's findings that additional relapse awareness training would not correct her substance abuse. Sweet's relapse and minimization of her use of marijuana is substantial evidence supporting the trial court's finding that there was little likelihood that conditions will be remedied so that the boys' can return to their mother in the near future.

Sweet contends that the trial court relied on extrinsic evidence to support its findings of fact that she would not benefit from a relapse awareness program and suffered from "major depressive disorder."[3] She argues that the trial court erred by relying on its "common experience" to reach its finding on relapse awareness, and that the record did not support that Sweet had major depressive

---

[3] "The mother claims she would be ready to parent after she completes the eight-week relapse awareness program. It is clear to this Court from both this Court's common experience with drug use and from the mother's history that relapse awareness is not going to cure the mother's severe, very long-term substance abuse problem." FF 2.68

"The mother has been diagnosed with major depressive disorder." FF 2.74.

"The mother has chosen not to take medication to treat her depression even though it was recommended." FF 2.85

CP at 15.

disorder. The Department argues that substantial evidence in the record supports these findings.[4]

With respect to the relapse awareness program, we agree with the Department. As discussed above, there is substantial evidence that, due to the mother's substance abuse history, an additional eight-week relapse awareness program would not remedy conditions such that the children could return home. This is substantial evidence supporting the trial court's finding, independent of any "common experience" of the court.

But we agree with Sweet with respect to finding of fact 2.74 related to major depressive disorder. Substantial evidence does not support that Sweet was diagnosed with major depressive disorder. Rather, the record supports that Sweet felt depressed or had situational symptoms of depression with which she struggled. Sweet argues further that this erroneous finding is the basis for additional findings related to her mental health and thus requires reversal. We disagree. Regardless of its characterization, substantial evidence supports the challenged findings that Sweet was depressed, that she was not actively engaged in treatment of her depression, and that the depression impacted her

---

[4] The Department initially argues that Sweet raises this issue for the first time on appeal. But the Department does not cite authority for its proposition that a parent can waive an argument on insufficiency of the evidence due to a failure to object at trial.

11

parenting.[5]

## Diminishing Prospects for Early Integration Into a Permanent Home

Sweet next argues that the Department did not prove that continuation of the parent-child relationship diminished the boys' prospect for early integration into a stable and permanent home as required by RCW 13.34.180(1)(f). She contends that the Department failed to meet its burden with respect to this element because it did not prove that a less restrictive alternative to termination, such as dependency guardianship or open adoption, was unavailable.

Contrary to Sweet's argument, this statutory element does not require that the Department prove there is no less restrictive alternative to termination. The court is under no obligation to consider a dependency guardianship as an alternative to termination where such an option was not being considered by the Department. In re Dependency of K.S.C., 137 Wn.2d 918, 930, 976 P.2d 113 (1999). Sweet cites In re Welfare of S.V.B., 75 Wn. App. 762, 880 P.2d 80 (1994) for her contention that the trial court must consider a guardianship as a less

---

[5] "The mother has chosen not to take medication to treat her depression even though it was recommended." FF 2.85; "The mother's testimony and demeanor in court have convinced the court that it would be beneficial not just for the mother's own wellbeing but also for her interactions with her children to follow through more with her mental health treatment and medication recommendations." FF 2.86; "The mother's depression feeds into both her chemical dependency and her inability to actively parent." FF 2.87; "The mother's depression plays a role in the fact that when the Department added another weekly visit in summer 2016 she missed three visits because the visits were in the morning and she could not wake up in time, which resulted in a termination of those visits." FF 2.88; "The mother's tendency to watch videos during brief visits indicates an inability to actively parent or actively participate with her children. This is likely a result of the mother's depression and a lack of self-esteem." FF 2.90; "The mother's unwillingness to do anything about the safety concern raised in Spring 2016 regarding a bookshelf that [X.C.S.-H.] was climbing on until her home was remodeled (which didn't occur until March 2017) is another sign of a lack of active parenting and actively doing something about a problem." FF 2.91; "The mother has lingering parental deficiencies. The mother has an ongoing mental health and substance abuse problem that are not being appropriately addressed." FF 2.96

12

restrictive alternative prior to terminating parental rights. But S.V.B. held that where one child was already in a guardianship, rather than foster care, continuation of the parent-child relationship did not diminish that child's prospect for integration into a stable and permanent home. Here, there was no guardianship already in place, so S.V.B. is inapposite.

Similarly, the court has no obligation to find that open adoption is unavailable as a less restrictive alternative. Sweet cites In re Welfare of H.Q., 182 Wn. App. 541, 330 P.3d 195 (2014) in support of her argument. But in that case, the court held that due process requires that voluntary relinquishment, which would enable open adoption, must be available. Voluntary relinquishment was available to Sweet, but she did not avail herself of that option.

The lack of evidence regarding the availability of less restrictive alternatives did not cause the Department to fail to prove that continuation of the parent-child relationship diminished the boys' prospect for early integration into a stable and permanent home.

Best Interests of the Child

Finally, Sweet argues that the Department failed to prove that termination of her parental rights was in the children's best interests as required by RCW 13.34.190(1)(b). She contends that testimony supported that the boys would benefit from having her in their lives.[6]

---

[6] Sweet assigns error to findings of fact 2.116 and 2.117. Finding of fact 2.116 states: "It is in the best interest of [X.C.S.-H.] and [L.J.S.] that all of the parental rights of the mother be terminated under RCW 13.34.180 and .190." Finding of fact 2.117 states: "While the court believes that the children would greatly benefit from a relationship with their mother that is not an issue that the court can control." CP at 17.

No. 77281-3-I/Consolidated w/No. 77282-1-I/14

The evidence at trial established that the boys were doing well in their current placement, were entitled to permanency as soon as possible, and that delay for Sweet to redress her parental deficiencies would diminish the boys' prospects for integration into a stable and permanent home. The guardian ad litem, Department social workers, and Ms. Pearl acknowledged the affection between Sweet and the boys, and their preference that Sweet maintain some contact with them. But they nevertheless recommended termination of parental rights and adoption based on the boys' progress in foster care, their high level of needs, Sweet's ongoing substance abuse issues, her relationship with a man with a domestic violence history, and her mental health issues that were not properly addressed. VRP at 145; 340; 391-92; 437.

Because substantial evidence supports the trial court's findings, we reject Sweet's appeal and affirm the termination order.

Affirmed.

WE CONCUR:

Spearman, J.

Trickey, J

Becker, J.

14