[No. 1417-1.   Division One—Panel 1.   August 7, 1972.]

*In the Matter of the Welfare of* CHARLIE L. HOUTS, III, *et al., Minors.*

*Davies, Pearson, Anderson & Gadbow* and *John C. Kouk-lis,* for petitioners.

*Ronald L. Hendry, Prosecuting Attorney, Joseph D. Mladinov, Special Counsel,* and *Eugene G. Olson, Chief Criminal Deputy,* for respondent.

HOROWITZ, C.J.—Petitioners, Charlie L. and Patricia Houts, seek review by certiorari of a juvenile court order permanently depriving them of their son and daughter. At the time the order was entered their son was 3½ years of age and their daughter 6 months of age. The controlling question presented is whether the hearing, resulting in the order of permanent deprivation, conformed to due process requirements. We hold it did not and reverse for a new trial.

In referring to the evidence in our statement of the case, we do so notwithstanding that much of it was received in the absence of Mr. and Mrs. Houts under circumstances later explained. Mr. and Mrs. Houts were married in 1967. Mrs. Houts had been a patient in the Western State Hospital on an in-and-out basis since 1953. She was suffering from chronic schizophrenia. There was psychiatric testimony that she would "be in and out of some mental institu-

tion for the rest of her life." Her condition, however, could be and was controlled by medication. A psychiatrist testified that if she did not take medication her ability to take care of her children would be adversely affected. There was evidence that 2 months before Mrs. Houts had failed to take her prescribed medication. As a result she was unable to look after her youngest child who had soiled her diapers while she was being held by her mother at a counter in a drugstore. Nevertheless, the psychiatrist testified that she was no danger to the physical safety of her children, saying, "I don't think Mrs. Houts is a dangerous person, but she is unpredictable." There was no evidence that she had failed to take her medication since the drugstore incident. She testified she fully intended to take the medication prescribed.

Mr. Houts, while a patient at the same hospital, was considered a paranoid schizophrenic. He was discharged, however, in 1969. No opinion testimony was offered concerning his mental condition since discharge. Mr. Houts did testify that, since his discharge, he continued to take medication and that, from time to time, he visited a community mental health clinic on a "consultation basis." Aside from the stipulation of trial counsel for Mr. and Mrs. Houts later referred to, no testimony was introduced that Mr. Houts was unpredictable in his conduct or dangerous to his children.

On August 30, 1968, their son had been made a ward of the juvenile court and was under foster home care. At the time of the trial, the daughter had not been made a ward of the court as a dependent child. The dependent status of that child, however, was an issue below.

The evidence showed that both Mr. and Mrs. Houts loved their children. Both parents testified that they wanted their children back in the home. A psychiatrist who treated Mrs. Houts testified in the state's case. There was no testimony presented concerning whether the children here were schizophrenic. The psychiatrist stated, however, that from a statistical point of view, if two schizophrenic people have

children the chances of their offspring being schizophrenic are 85 percent. If only one member is schizophrenic, the chances statistically are only 15 percent. He was unable to state whether the figures testified to were caused by heredity or environment.

In the hearing below, the state was represented by a deputy prosecuting attorney for Pierce County. The minor children were represented by a guardian ad litem who was an attorney. Mr. and Mrs. Houts were represented by their attorney.

At the outset of the hearing the court stated:

[T]he record may show . . . that it has been stipulated that for the orderly hearing in the matter that they [Mr. and Mrs. Houts] probably should not be present, but should remain until they are called.

The court then appointed the attorney for Mr. and Mrs. Houts as their guardian ad litem. The attorney accepted the appointment without objection to the procedure used in making it.

The record does not affirmatively show what, if anything, occurred prior to the stipulation referred to by the court. Neither does the record show whether Mr. and Mrs. Houts were in the courtroom when the court described the stipulation of counsel, when their guardian ad litem was appointed, or during the presentation of the state's case. However, Mr. and Mrs. Houts' counsel on appeal states without contradiction by the state's appeal counsel, and consistently with the court-announced stipulation providing for the exclusion of the Houts from the hearing, that neither of the parents was in the courtroom during the presentation of the state's testimony.

The state presented five witnesses, including the testimony of a psychiatrist. The testimony dealt principally with the conduct of Mr. and Mrs. Houts concerning their son and daughter and dealt also with Mrs. Houts' mental condition. Mr. and Mrs. Houts were called by their attorney and guardian ad litem to testify to various matters includ-

ing the parents' relationship to and love for their two children.

Several matters involving trial procedures were taken up with the court in chambers by counsel for Mr. and Mrs. Houts. There is no showing that the Houtses were made aware of what occurred in chambers or that they authorized their attorney to act on their behalf in the respects shown by the record. Thus their attorney and guardian ad litem expressed a willingness to stipulate that "Mr. Houts was mentally ill." He requested, and the state agreed to terminate the cross-examination of Mr. Houts "because of the agitation it was causing Mr. and Mrs. Houts." Their attorney also requested that "witness Mary Margaret Lang not be cross-examined about the condition of the child in Longview or about who had contacted the authorities because the witness was afraid and did not want the Houtses to know that she had . . . [contacted the authorities] out of concern for Charlie Houts III's appearance." When the assigned caseworker for the Department of Social and Health Services was called as a witness by the state, the trial attorney for Mr. and Mrs. Houts stated, ". . . it's my wish that the Houts do not hear this type of testimony . . ." The court stated, "I'll leave it to you and Mr. Loomis to determine when you think it would be safe for the defendants."

At the conclusion of the trial, the court entered findings, conclusions and an order of permanent deprivation. This petition for review and order for certiorari then followed.

Petitioners have assigned 12 errors. The first 11 are directed to the findings and conclusions. The 12th assignment reads, "Procedural irregularities at trial deprived petitioners of the right to confront witnesses against them, in violation of due process." That assignment made raises the controlling question on this appeal.

■ A parent is entitled to notice and opportunity to be heard before a court may enter an order permanently depriving him of the custody of his child. The right is protected by the due process clauses of the state and federal

constitutions. U.S. Const. amend. 14; Const. art. 1, § 3; *In re Petrie*, 40 Wn.2d 809, 246 P.2d 465 (1952); *Stanley v. Illinois*, 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972). The right to a hearing ordinarily includes the right to be present. *Harter v. State*, 260 Iowa 605, 149 N.W.2d 827 (1967); *Swindell-Dressler Corp. v. Dumbauld*, 308 F.2d 267 (3d Cir. 1962); *Clampitt v. Johnson*, 359 P.2d 588 (Okla. 1961); *Leonard's of Plainfield, Inc. v. Dybas*, 130 N.J.L. 135, 31 A.2d 496 (1943); *Cockrell v. Taylor*, 347 Mo. 1, 145 S.W.2d 416 (1940); *Shields v. Shields*, 26 F. Supp. 211 (W.D. Mo. 1939). *Cf.* Const. art. 1, § 22; U.S. Const. amend. 6.

▮ A parent, having a constitutional right to a hearing to defend himself against being permanently deprived of his child, may employ counsel to assist him. Such counsel, upon accepting employment, is under a duty to use his best efforts by lawful means to prevent the entry of an order of permanent deprivation. As an attorney, he is impliedly authorized to enter into stipulations and waivers concerning procedural matters to facilitate the hearing. However, in his capacity as attorney, he has no authority to waive any substantial right of his client. Such waiver, to be binding upon the client, must be specially authorized by him. As stated in *Wagner v. Peshastin Lumber Co.*, 149 Wash. 328, 337, 270 P. 1032 (1928), "It will be readily admitted that an attorney without special authority has no right to stipulate away a valuable right of his client." This rule is also stated elsewhere. *Linsk v. Linsk*, 70 Cal. 2d 272, 449 P.2d 760, 74 Cal. Rptr. 544 (1969); *Jackson v. United States*, 221 F.2d 883 (D.C. Cir. 1955); *De Long v. Owsley's Executrix*, 308 Ky. 128, 213 S.W.2d 806 (1948); *Fresno City High School Dist. v. Dillon*, 34 Cal. App. 2d 636, 94 P.2d 86 (1939); *Laurent v. Costa*, 61 A.2d 804 (D.C. Mun. Ct. App. 1948); 1 E. Thornton, Attorneys at Law, §§ 258, 263 (1914).

▮ On the question of the appointment of a guardian ad litem, the law requires such an appointment for a minor or insane person, whether or not the latter is an adult. RCW 4.08.050, 4.08.060; *Graham v. Graham*, 40 Wn.2d 64,

240 P.2d ·564 (1952). However, if the appointment is for an adult and there is objection or resistance to the appointment:

> [A]n adjudication of incompetency must precede, or at least be contemporaneous with, the appointment of a guardian *ad litem;* and in that connection, that an alleged incompetent has· a right to defend and is entitled to be heard.

40 Wn.2d at 68. The court explained:

> [T]hat a guardian *ad litem* should not be appointed by the court unless a full and fair opportunity is given to the alleged incompetent to defend and to be heard. There is something fundamental in the matter of a litigant being able to use his personal judgment and intelligence in connection with a lawsuit affecting him, and in not having a guardian's judgment and intelligence substituted relative to the litigation affecting the alleged incompetent. Furthermore, there is something fundamental in a party litigant being able to employ an attorney of his voluntary choice to represent him in court and in being free to reject or accept the advice of such attorney. The interposition of a guardian *ad litem* could very well substitute his judgment, inclinations, and intelligence for an alleged incompetent's; furthermore, the retention of legal counsel or the employment of a different attorney could be determined by the guardian *ad litem,* subject, of course, to some direction and control by the court, and the latter might be open to some question.

40 Wn.2d at 67.

Even if the appointment is one made after hearing and determination of incompetency, the guardian ad litem is no more permitted to waive a substantial right of the ward than is an attorney for a competent client. *Calhoun County Bank v. Ellison,* 133 W. Va. 9, 54 S.E.2d 182 (1949); *Fox v. Starbuck,* 115 W. Va. 39, 174 S.E. 484 (1934); *First Trust Co. v. Hammond,* 139 Neb. 546, 298 N.W. 144 (1941); *Peterson v. Hague,* 51 Idaho 175, 4 P.2d 350 (1931).

It is true that in *Graham v. Graham, supra,* the appointment of the guardian ad litem was over objection made to the trial court. In the instant case, however, there is no

showing that either Mr. or Mrs. Houts was present and knew of the stipulation and court order excluding them so as to be in a position to object; or that they knew that their attorney had been appointed guardian ad litem and had consented to the appointment without objection; or, whether or not present, that they had intentionally, understandingly, freely and voluntarily waived their right to object to their exclusion from the courtroom.

By not insisting upon a hearing on the issue of the competency of Mr. and Mrs. Houts, their attorney in effect impliedly admitted that both his clients were either mentally incompetent or so far incompetent that they needed the protection of a guardian ad litem. This implied admission became an express admission with respect to Mr. Houts when, while in chambers and apparently outside the presence of Mr. and Mrs. Houts, he expressed a willingness to stipulate that "Mr. Houts was mentally ill." The state consented. The breadth of the stipulation was such as to substantially impair whatever chances Mr. and Mrs. Houts might otherwise have had to prevent entry of an order of permanent deprivation against the parents. Furthermore, their attorney's and guardian ad litem's stipulation that neither Mr. nor Mrs. Houts be present during the hearing of the state's case, and later his request that the cross-examination of Mr. Houts be terminated and that the witness Mary M. Lang not be cross-examined, and his statements to the court that he did not wish Mr. and Mrs. Houts to hear the testimony of the caseworker for the Department of Social and Health Services called by the state, further diminished their chances of preventing the order of permanent deprivation. There is nothing in the record to show, nor is there any finding that the admissions and stipulations and requests of their counsel and guardian ad litem were ever authorized by either Mr. or Mrs. Houts so as to be binding upon them. *See Kallen v. Pollock,* 412 Pa. 281, 194 A.2d 227 (1963).

It should be noted that a further difficulty presents itself when an attorney agrees to act as a guardian ad litem for

an adult. If the adult is in fact incompetent at the time of the hearing, even though he was competent when he retained the attorney, the subsequent incompetency serves to terminate the attorney's authority to act as his attorney. Thus, W. Seavey, Agency, § 48 at 90 (1964) discussing the rule, cites *Yonge v. Toynbee,* [1910] 1 K.B. 215 (1909), which holds that an unknowing solicitor is liable for costs. *See* Restatement (Second) of Agency § 122 (1958).

The trial court was no doubt influenced by the stipulations and requests and statements of the attorney for Mr. and Mrs. Houts. Thus, he entered an express finding reading, "At the first conference, their attorney stipulated that Mr. Houts was mentally ill, and Mr. Houts was excused from further testimony."

We have no doubt the trial counsel for Mr. and Mrs. Houts, counsel for the other parties, and the court as well were all well motivated in following the procedure used below. However, good motives do not excuse the violation of the parents' constitutional right to a hearing when parents are sought to be permanently deprived of their children. We agree with retained counsel on appeal for Mr. and Mrs. Houts that the hearing did not conform to due process requirements.

The judgment is reversed with direction to grant a new trial.

WILLIAMS and CALLOW, JJ., concur.