

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2015 MAR -2 AM 8: 53

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Dependency of P.H.V.S., dob 3/29/13, | ) ) ) | No. 71300-1-I |
| A minor child, | ) ) | (Consolidated with No. 71301-9-I) |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | ) ) ) ) ) | |
| Respondent, | ) ) ) | PUBLISHED IN PART OPINION |
| v. | ) ) ) | |
| HEIDI GABHART and RICHARD SMITH, | ) ) ) ) | |
| Appellants. | ) ) | FILED: March 2, 2015 |

SCHINDLER, J. — Richard Smith and Heidi Gabhart are the parents of P.H.V.S. Smith and Gabhart seek reversal of the order of dependency and disposition order. The court found P.H.V.S. dependent because neither parent was capable of adequately caring for the child such that the circumstances constituted a substantial danger to the child's psychological or physical development under RCW 13.34.030(6)(c). Smith contends the absence of his guardian ad litem (GAL) during a portion of the dependency fact-finding hearing violated the mandatory statutory and GALR requirements and his right to due process. Smith also asserts insufficient evidence

supports finding that he was not capable of adequately caring for P.H.V.S. or that the child was in circumstances constituting a danger of substantial harm. Gabhart contends insufficient evidence supports finding the Washington State Department of Social and Health Services made reasonable efforts to eliminate the need to remove P.H.V.S. Gabhart also asserts her attorney provided ineffective assistance of counsel and violation of her right to due process. We hold the absence of Smith's GAL during a morning session of the four-day dependency fact-finding hearing violated the mandatory statutory and GALR requirements. However, because the record shows there was little or no risk of error, we hold there was no violation of his right to due process. We also hold that substantial evidence supports the finding of dependency under RCW 13.34.030(6)(c) and Gabhart cannot establish either ineffective assistance of counsel or violation of due process. Accordingly, we affirm.

## FACTS

Heidi Gabhart and Richard Smith have lived together since 2010. Gabhart and Smith are the parents of P.H.V.S., born on March 29, 2013.

Gabhart is the mother of three other children: 20-year-old F.O., 7-year-old J.S., and 4-year-old A.G. F.O. has lived with his father since the age of 13. In May 2007, the Washington State Department of Social and Health Services (Department) removed 6-month-old J.S. from Gabhart because of concerns about her "deteriorating mental health." The court found J.S. dependent and ordered Gabhart to participate in a psychological evaluation, mental health counseling, and medication management. Gabhart did not participate in services. The Department placed J.S. with her father.

A.G. was born in Nevada on September 7, 2008. While in the hospital, Nevada child protective services removed A.G. from Gabhart's care. Gabhart was diagnosed with paranoid schizophrenia. The court found A.G. dependent. Gabhart did not participate in mental health services or follow through with referrals for housing. In 2009, the court terminated Gabhart's parental rights to A.G.

In February 2013, Gabhart went to Dr. Nicole Ingrisano for prenatal care. Gabhart told Dr. Ingrisano that she had not engaged in mental health services for "well over a year" and had "no desire to be on medications." When Dr. Ingrisano tried to talk to Gabhart about her mental health, Gabhart became "very easily agitated" and "angry." Gabhart made comments to Dr. Ingrisano about the father of the child, suggesting he was "temperamental and that she was looking at moving out from him because he could be violent." Concerned about Gabhart's ability to care for an infant, Dr. Ingrisano instructed the hospital to put a "hold" on the baby.

After P.H.V.S. was born on March 29, 2013, Dr. Ingrisano asked clinical social worker Jennifer Cruze to assess Gabhart. Cruze met with Gabhart on March 30. Gabhart told Cruze she had a diagnosis of "psychosis NOS"[1] and reported "hearing voices in her head sometimes." Gabhart said she was not engaged in mental health treatment and was not currently on any medication to treat her illness. Gabhart told Cruze that she received Social Security disability income "for her mental health diagnosis." Cruze made a referral to Washington State Department of Social and Health Services Child Protective Services (CPS).

CPS social worker Molly Rice met with Gabhart and Richard Smith at the hospital that same day. Beforehand, hospital staff told Rice that Gabhart reported having

---

[1] Not otherwise specified.

hallucinations and hearing voices. During the meeting, Rice had to repeat questions multiple times "due to [Gabhart] just not answering them." Rice said Smith's breath smelled of alcohol and he was "not able to answer questions directly."

CPS social worker Kyla Madsen met with Smith on April 1. Smith told Madsen that he had been " ' "taking care of [Gabhart]" for the last 2-3 years.' " Smith said that Gabhart had been " 'passing out, falling over, and losing consciousness for "years." ' " Madsen testified that Smith " 'appeared to have some cognitive delays or difficulty communicating in a clear way,' " and while he was " 'obviously concerned about both Mom and child,' " he " 'appeared unable to understand [the] severity of [the] circumstances.' "

On April 2, Madsen, a CPS supervisor, Gabhart, Smith, and Smith's niece Amanda Twiggs-Johns attended a "Family Team Decision Making" meeting. During the meeting, Gabhart "almost passed out or fell asleep. Her eyes became groggy, her mouth was slightly agape, [and] her head bobbed." After approximately five to seven minutes, Gabhart "returned to a normal state and continued with the conversation." Gabhart said she had "a neurological condition." Twiggs-Johns told Madsen and the CPS supervisor that "the family has seen several instances where Mom has passed out during busy family functions." Twiggs-Johns said she did not think Smith "fully processed or understood the seriousness of Mom's condition." Twiggs-Johns did not know if Smith had a mental illness but said he "has behaviors that are concerning including his inability to clearly process information, communicate with others, and recognize the signs of Mom's condition."

On April 3, the Department filed a dependency petition alleging the child was abused or neglected, or had no parent, guardian, or custodian capable of adequately caring for the child such that circumstances constituted a danger of substantial damage to the child's psychological or physical development under RCW 13.34.030(6)(b) and (c).

The Department recommended P.H.V.S. remain in out-of-home care, asserting Gabhart's untreated mental health issues constituted a danger to the child.

> The mother cannot control her behavior due to her significant mental health issues and this threatens child's well-being and safety. She is exhibiting psychotic like features in her behavior and has minimal insight into how her mental health impacts her parenting despite the assistance of multiple providers to facilitate her understanding. The mother's mental health issues prevent her from meeting child's cognitive, emotional, and developmental needs.

The Department alleged Smith's mental health status was unknown and he exhibited an "inability to recognize signs of concerns in Mom's behavior."

At the shelter care hearing on April 8, the court placed P.H.V.S. in foster care. The court entered an order requiring Gabhart and Smith to each obtain a psychological evaluation and follow treatment recommendations. The court authorized weekly supervised visits with P.H.V.S. and set a dependency fact-finding hearing for June 7.

In May, Smith's attorney Lorraine Roberts filed a motion to investigate Smith's competency and determine whether to appoint a guardian ad litem (GAL). The court appointed Shawn Crowley as the investigative GAL for Smith. In early June, Gabhart's attorney Matthew Pang asked the court to appoint a GAL to investigate Gabhart's competency. The court appointed Craig McDonald as the investigative GAL for Gabhart. The court continued the dependency fact-finding hearing to August 23.

5

Crowley recommended the court appoint a GAL for Smith. Crowley stated that Smith had "difficulty in comprehending abstractions" and because he was not "capable of weighing the merits of the various legal options involved in this case[,] I'm doubtful he can meaningfully assist his attorney beyond stating his goal of having the child returned home."

McDonald recommended the court appoint a GAL for Gabhart. McDonald stated Gabhart's "understanding of the legal process is, at best, minimal" and "she did not seem to retain information, veered off track and ultimately became unresponsive."

After holding separate competency hearings, the court ruled Smith and Gabhart were "not competent." The court found that neither Smith nor Gabhart could understand or intelligently "comprehend the significance of the legal proceedings and their effect on [his/her] best interests." The court appointed Crowley as the GAL for Smith and McDonald as the GAL for Gabhart "to assist" each parent "in these dependency proceedings." The court continued the dependency fact-finding hearing to September 10.

The dependency fact-finding hearing began on October 22. Gabhart; her GAL, McDonald; her attorney Pang; Smith; his GAL, Crowley; his attorney Roberts; the court appointed special advocate (CASA) for P.H.V.S.; the attorney representing the CASA; the Department; and social worker Noemi Peredo appeared for the dependency fact-finding hearing. At the beginning of the hearing, Gabhart's attorney made a motion to continue the hearing until Gabhart was found competent. The court denied the motion to continue.

Fifteen witnesses testified during the four-day dependency fact-finding hearing, including Dr. Ingrisano, Cruze, Rice, Madsen, and Twiggs-Johns.

Cruze and Madsen testified the first day. Madsen testified that when she spoke with Smith at the hospital, "[h]is conversation just was very sporadic and all over the place." For instance, when Madsen asked Smith if he had any Native American ancestry, Smith told her that he was "100 percent White and that he had learned that he was full Irish. And then in the next breath he told me that he was 100 percent Aztec Indian and started talking about how Aztec Indians had all been . . . obliterated." Madsen stated that when she talked to Smith about his failure to recognize the severity of Gabhart's mental illness, Smith "got really upset with me and told me that I was twisting his words."

Five witnesses testified the second day, including Dr. Steven Haney, CPS social worker Rice, the CASA for P.H.V.S., a visitation supervisor, and a mental health crisis and intake specialist.

Dr. Haney conducted a mental health evaluation of Gabhart in April 2013. Dr. Haney testified that Gabhart reported hearing voices and "seemed somewhat depressed and anxious." Dr. Haney diagnosed Gabhart with schizoaffective disorder. Dr. Haney said Gabhart told him she was hospitalized for mental health concerns in 2000 and again in 2007. Gabhart told Dr. Haney she was "put on a whole range of medications" after her first hospitalization but did not think the medications were helpful and stopped taking the medications altogether. Dr. Haney testified that Gabhart "did not have any insight into her mental illness and thus did not see herself as having mental illness."

The CASA for P.H.V.S., Jennifer Franklin, recommended P.H.V.S. remain in foster care. Franklin testified that after observing Gabhart and Smith interact with P.H.V.S., she did not believe they could "meet the basic needs of the baby." Franklin said the parents did not "respond to [the baby's] cues or seem to know what to do when she's upset." Franklin recommended Gabhart and Smith each obtain a psychological evaluation and parenting coaching.

Monet Frazier supervised visitation with P.H.V.S. Frazier said Smith and Gabhart "consistently come to all visits" but Gabhart would "nod off" during approximately half of the visits. Frazier testified that there was an ongoing problem with the parents preparing and feeding P.H.V.S., and she had to remind Smith "several times that he needed to support the baby's neck." Frazier said that after Gabhart and Smith began working with a parent coach, they were better able to respond to P.H.V.S. and seemed "more comfortable" around the baby. Frazier testified Gabhart typically did "the majority [of] all child care" during the visits, such as feeding and changing diapers, but Smith had "taken on a little bit more of that role in the last few weeks." Cross-examination of Frazier was not complete at the end of the second day of the fact-finding hearing.

Before the beginning of the third day of the dependency fact-finding hearing, Smith's court-appointed GAL sent an e-mail stating he did not plan to attend the morning session but wanted the court to proceed without him. The attorneys representing Smith and Gabhart did not object.

> THE COURT: . . . I notice that Mr. Crowley's not here, but I understand he wants us to proceed without his — without him.
> MR. McDONALD: Correct.

MR. PANG: That's what he indicated by e-mail.
MR. McDONALD: Correct.

During the morning session of the third day, the parties completed cross-examination of Frazier, Nevada social worker Natalie Miller testified, and the Department began the direct examination of social worker Noemi Peredo.

Miller testified that she was involved in the Nevada dependency and termination proceedings concerning A.G. Miller said that Gabhart appeared "erratic" and "delusional" but denied having any mental health issues.

Peredo testified that she had met with Gabhart and Smith at least three times a month for the past six months. Peredo said that Smith and Gabhart were "very responsive to the feedback that the parent coach gives them" but continued to ask "the same question again." Peredo testified that during the visits she supervised, Gabhart "tended to the baby." Smith "would be watching the mother and the baby" and "would only hold the baby, like, once or twice, and it wouldn't last for a very long time."

Crowley was present when the dependency fact-finding hearing reconvened for the afternoon session. During the afternoon session, Dr. Ingrisano and a mental health case manager who worked with Gabhart testified.

On the fourth and final day of the dependency fact-finding hearing, the Department recalled Peredo to complete direct examination and four other witnesses testified, including Twiggs-Johns and Dr. Maria Flores.

Peredo testified that Gabhart was no longer engaging in mental health treatment and that Gabhart told her she had stopped taking the medications "a few months" before September. Peredo testified that Smith gave "conflicting information" about whether he had ever sought mental health services or taken medication for a mental

9

illness. Peredo reiterated that during the visits with P.H.V.S., Gabhart did the majority of the basic child care, like changing diapers, and that in the beginning, Smith was "really not engaged in holding the baby" and there was a "lack of interaction between the father and the baby." Peredo also repeated her concerns about Smith's "ability to process information" because he asked the same questions multiple times. Peredo testified that P.H.V.S. would "be at risk of neglect" if she were placed in her parents' care. Peredo stated that in her opinion, Gabhart and Smith were "not able to care for the child at this time."

> The mother has mental health issues that — and she has not seek [sic] consistent treatment for that. The father has confidence in the mother's ability to care for the child. And the father does not seem to have understanding of the mother's limited capacity to take care of herself and an infant.[2]

Dr. Flores had been Gabhart's primary care doctor since 2002. Dr. Flores testified that Gabhart had paranoid schizophrenia and was bipolar. Dr. Flores testified that Gabhart's symptoms had become worse over the last two years. Dr. Flores stated that she was concerned when Gabhart became pregnant with P.H.V.S. because she did not believe Gabhart would be able to care for a child. Dr. Flores said she never met Smith but her impression from Gabhart was that it "wasn't a stable relationship."

Gabhart frequently interrupted the hearing with inappropriate comments. On at least two occasions, Gabhart appeared to be "nodding off" and "her eyes rolled back in her head so that the whites showed." Gabhart requested medical attention after one of the episodes.

The court found P.H.V.S. dependent under RCW 13.34.030(6)(c) because neither parent was "capable of adequately parenting the child and there's danger of

---

[2] Alteration in original.

substantial damage to the child's physical and psychological development." Because Smith was in denial about the seriousness of Gabhart's condition, the court found he was not able to assume responsibility as the primary caregiver.[3]

The court entered an order of dependency ordering P.H.V.S. to remain in out-of-home care. The order of disposition requires Gabhart to obtain mental health counseling and follow through with treatment recommendations, including taking medications as prescribed. The court ordered Smith to obtain a psychological evaluation "with parenting component and a cognitive component and follow through with any treatment recommendations."[4] Smith and Gabhart appeal the order of dependency and disposition order.

---

[3] The court ruled, in pertinent part:

I think these parents want the child. They are trying. They're consistently going to the supervised visit. They're making as much effort as they can, but they have issues, psychological issues that are — it's making it very difficult for them to follow directions, comprehend, change behavior. . . .

But the concern of this Court is truly and profoundly the issue of the mother having some untreated mental health issue, Father appears to also, and the mother having some untreated medical issues. . . .

. . . I think it's undisputed that at the time the baby was born, at least, [Gabhart] wasn't taking her meds and she wasn't in any treatment. Her behavior in Court, both her mental behavior where she's not able to control herself and has some frequent outbursts — I'm saying "outburst" in the mildest manner. I mean, I don't — she's not, you know, loud and angry, but she is expressing her opinions inappropriately during court.

So my observation is that she's not able to manage her behavior. Plus she's had two, at least, medical incidents, one where 911 was called at her request because she was nodding off or passing out or something. . . . [I]f Mom is nodding off, there's a risk to the child's physical safety if she can't watch her.

There's argument that perhaps the father can pick up the slack. But the father has expressed to multiple witnesses that either she doesn't nod — the mother doesn't nods [sic] off or the mother is just tired from working. There's some denial going on . . . .

. . . .

. . . So there's concern that the father is not going to be able to pick up the slack in this case. That's my fear in this case about the baby. I hope both parents can have an evaluation done to determine what needs to be addressed in terms of their mental health issues, the mother can figure out what it is, is wrong medically.

I feel that the Department has proved by a preponderance that the child is dependent. And, frankly, if — I don't think the child is safe without some services.

[4] Emphasis omitted.

ANALYSIS

<u>Absence of GAL</u>

Smith seeks reversal of the order of dependency on the grounds that the absence of his GAL during the morning session of the third day of the dependency fact-finding hearing violated RCW 4.08.060, the Guardian ad Litem Rules, and due process.

Under RCW 4.08.060, if an incapacitated person is a party to an action, he "shall appear by guardian."[5] RCW 4.08.060 provides, in pertinent part:

> When an incapacitated person is a party to an action in the superior courts he or she shall appear by guardian, or if he or she has no guardian, or in the opinion of the court the guardian is an improper person, the court shall appoint one to act as guardian ad litem.[6]

In <u>In re Welfare of Dill</u>, 60 Wn.2d 148, 150, 372 P.2d 541 (1962), the Washington Supreme Court held that the requirements of RCW 4.08.060 are "mandatory" and an incapacitated person "can appear in court only by a guardian ad litem or by a regularly appointed guardian."

In <u>Dill</u>, the Department filed a dependency petition alleging the mother was mentally ill and the father could not care for the children. <u>Dill</u>, 60 Wn.2d at 149. Approximately six months after the mother was "adjudicated as mentally ill" and committed to Western State Hospital, she was "granted a terminal leave." <u>Dill</u>, 60 Wn.2d at 149-50. The Department filed a petition to terminate the parents' rights to the children. The mother and father appeared "with their attorney" at the termination hearing. <u>Dill</u>, 60 Wn.2d at 149. The court entered an order terminating the parents'

---

[5] Emphasis added.

[6] It is well established that use of the word "shall" indicates a mandatory obligation. <u>See</u> <u>Amren v. City of Kalama</u>, 131 Wn.2d 25, 35, 929 P.2d 389 (1997); <u>Wash. State Coal. for the Homeless v. Dep't of Soc. & Health Servs.</u>, 133 Wn.2d 894, 907-08, 949 P.2d 1291 (1997); <u>Strenge v. Clarke</u>, 89 Wn.2d 23, 29, 569 P.2d 60 (1977).

rights to their children. Dill, 60 Wn.2d at 149.

The Supreme Court reversed. The court rejected the argument that because the mother was represented by counsel, the statutory requirements were met. Dill, 60 Wn.2d at 150-51. "The statutory mandate is not satisfied when the person under legal disability is represented by an attorney." Dill, 60 Wn.2d at 150. The court held RCW 4.08.060 was mandatory and the mother could appear and participate only through a GAL. Dill, 60 Wn.2d at 150.

> A person under such legal disability can appear in court only by a guardian ad litem or by a regularly appointed guardian. A guardian ad litem has complete statutory power to represent the interests of the ward. Rupe v. Robison, 139 Wash. 592, 595, 247 Pac. 954 . . . (1926). See, also, In re Miller, 26 Wn. (2d) 202, 173 P. (2d) 538 (1946).

Dill, 60 Wn.2d at 150.

The GALR also impose a mandatory obligation on the GAL to be present at the fact-finding hearing. The purpose of the GALR is to "establish a minimum set of standards applicable to all superior court cases where the court appoints a guardian ad litem . . . to represent . . . an adjudicated incapacitated person pursuant to Title 11, 13 or 26 RCW." GALR 1(a). GALR 2(l) expressly states the GAL "shall appear at any hearing for which the duties of a guardian ad litem or any issues substantially within the guardian ad litem's duties and scope of appointment are to be addressed."

Because the GAL had a mandatory obligation under RCW 4.08.060 and the GALR to attend and participate in the entire dependency fact-finding hearing, the court erred in proceeding without the presence of Smith's GAL. However, because the absence of the GAL during the morning session of the third day of the hearing created little or no risk of error, we conclude there is no due process violation.

The due process clause of the Fourteenth Amendment protects the rights of parents to the custody, care, and companionship of their children. In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992); U.S. CONST. amend. XIV. Parents have a fundamental liberty interest in the care and welfare of their minor children. In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). But this interest is not absolute. The State has a constitutionally protected parens patriae interest in protecting the best interests of the child and "the physical, mental, and emotional health of children." In re Welfare of Sumey, 94 Wn.2d 757, 762-63, 621 P.2d 108 (1980); Schermer, 161 Wn.2d at 941.

A dependency proceeding "is 'a preliminary, remedial, nonadversary proceeding' that does not permanently deprive a parent of any rights." Key, 119 Wn.2d at 609 (quoting In re A.W., 53 Wn. App. 22, 30, 765 P.2d 307 (1988)). Dependency proceedings are designed to protect children from harm, help parents alleviate the problems that led to intervention, and reunite families. In re Interest of J.F., 109 Wn. App. 718, 728, 37 P.3d 1227 (2001). In the context of a dependency proceeding, the essential requirements of due process are notice, an opportunity to be heard, and the right to be represented by counsel. Key, 119 Wn.2d at 611. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). In determining whether a procedure violates due process, we must consider three factors: (1) the parents' interests, (2) the risk of error created by the procedures used, and (3) the countervailing governmental interest supporting use of the challenged procedure. Key, 119 Wn.2d at 610-11; see Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S. Ct.

893, 47 L. Ed. 2d 18 (1976); Santosky v. Kramer, 455 U.S. 745, 754, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

Here, the record establishes little or no risk of error related to the absence of Smith's GAL at the morning session of the third day of the dependency fact-finding hearing. Nevada social worker Miller testified only about her involvement with Gabhart in the dependency and termination proceedings related to A.G.

Frazier's testimony concerning Smith's ability to parent P.H.V.S. repeated what she had testified to the day before. The day before, Frazier testified at length about her observations of Smith during the supervised visits with P.H.V.S. On cross-examination during the morning of the third day, Frazier repeated her earlier testimony that Gabhart was the primary caregiver during visits and that Gabhart and Smith asked "numerous" "[b]asic, necessary child care questions."

Peredo also testified during direct examination about Smith's ability to care for the child. Although Peredo's testimony during the morning session on the third day was critical of Smith's ability to care for P.H.V.S., Peredo repeated those same concerns when the Department continued direct examination and Smith and his GAL were present. Peredo reiterated that it was "strictly the mother that would be caring for the child" during visits and that she had to "make repeated statements" when "advis[ing] the father" because "he seems to forget information."[7]

---

[7] The record also shows the court disregarded testimony that Smith asserts was prejudicial by crossing out a number of proposed findings. Specifically, the court crossed out proposed findings based on Peredo's testimony that Smith smelled of cigarette smoke and P.H.V.S. would cry because of the smell, that Smith did not follow the proper feeding schedule and repeatedly gave P.H.V.S. an empty bottle to suck on, and that there were "control issues between the parents." The court also refused to order the drug and alcohol evaluation Peredo recommended, ruling there was insufficient evidence to warrant doing so.

We hold the absence of Smith's GAL during the morning session of the third day violated the mandatory statutory requirements and GALR, and the court erred in proceeding without the presence of Smith's GAL. But because the absence of the GAL resulted in little or no risk of error, there is no due process violation.[8]

Because the remainder of this opinion has no precedential value, the panel has determined it should not be published in accordance with RCW 2.06.040.

Sufficiency of the Evidence

In the alternative, Smith contends insufficient evidence supports finding P.H.V.S. dependent under RCW 13.34.030(6)(c).[9]

We review a trial court's decision in a dependency for abuse of discretion. In re Dependency of T.L.G., 139 Wn. App. 1, 15, 156 P.3d 222 (2007). A court abuses its discretion if the decision is manifestly unreasonable or based on untenable grounds or untenable reasons. T.L.G., 139 Wn. App. at 15.

To find a child dependent, the State must prove by a preponderance of the evidence that the child meets one of the statutory definitions of dependency under RCW 13.34.030(6). Key, 119 Wn.2d at 612. In this case, the trial court found P.H.V.S. dependent under RCW 13.34.030(6)(c). RCW 13.34.030(6)(c) provides that a child is dependent where the child "[h]as no parent . . . capable of adequately caring for the

_____

[8] Smith also contends his counsel provided ineffective assistance by failing to object to the absence of the GAL. Because we conclude the absence of the GAL did not violate due process, Smith cannot establish prejudice.

[9] Smith also assigns error to finding of fact 2.5 that states the Department made reasonable efforts to prevent or eliminate the need for removal but those efforts were unsuccessful because P.H.V.S.'s health, safety, and welfare could not be adequately protected in the home. However, Smith does not support the assignment of error with any argument. Where a party assigns error to a finding but presents no argument in their opening brief on any claimed assignment, that assignment of error is waived. Bosley, 118 Wn.2d at 809.

child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development."

The legislature has determined that in balancing the legal rights of parents against the rights of the child, the rights and safety of the child shall be the paramount concern. RCW 13.34.020; Schermer, 161 Wn.2d at 942. There are no specific factors a court must consider when determining whether a parent is capable of parenting under RCW 13.34.030(6)(c); rather, the inquiry is highly fact-specific. Schermer, 161 Wn.2d at 951-52. The State need not prove that a parent is unfit to prove a dependency. Schermer, 161 Wn.2d at 944.

> A dependency based on RCW 13.34.030[(6)](c) does not turn on parental "unfitness" in the usual sense. Rather, it allows consideration of both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs. Under RCW 13.34.030[(6)](c), it is unnecessary to find parental misconduct in order to find a child dependent.

Schermer, 161 Wn.2d at 944.

In evaluating a claim of sufficiency of the evidence in a dependency proceeding, we determine whether substantial evidence supports the trial court's findings of fact and whether the findings support the conclusions of law. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003). Evidence is substantial if, when viewed in the light most favorable to the prevailing party, a rational trier of fact could find the fact by a preponderance of the evidence. E.L.F., 117 Wn. App. at 245. In making this determination, this court does not weigh the evidence or the credibility of witnesses. In re Welfare of Sego, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973). Unchallenged findings are verities on appeal. J.F., 109 Wn. App. at 722.

Smith assigns error to findings of fact 2.2(dd) and 2.2(hh). Findings of fact

2.2(dd) and 2.2(hh) state, in pertinent part:

dd.   . . . . The mother mostly attended to the baby at visits, while the
      father watched.  The father needed a lot of guidance from Ms.
      Peredo on how to hold the baby.  At some visits, Ms. Peredo would
      have to remind the father how to hold the baby properly.  After
      holding the baby for 2-3 minutes, the father would give the baby back
      to the mother.

      . . . .

hh.   The mother performs the majority of child care tasks at visits,
      including feeding the baby, and changing her diaper.  The father only
      began changing diapers recently.  The father usually only holds the
      baby for a few minutes at a time, and then gives the baby back to the
      mother.

Substantial evidence supports the challenged findings.  Frazier and Peredo

testified that while Smith had recently become more involved in childcare

responsibilities during visits, Gabhart still did "the majority [of] all child care," such as

feeding and changing diapers, and that Smith typically would only hold P.H.V.S. for a

few minutes before giving her back to Gabhart.

Smith challenges the portions of findings of fact 2.2(w) and 2.2(oo)[10] that state he

is "in denial" about the significance of Gabhart's medical episodes and P.H.V.S. needs

to remain in out-of-home placement because of "the risk that the father would allow the

mother to care for the child alone."  Smith argues the findings are contrary to the record.

---

[10] Findings of fact 2.2(w) and 2.2(oo) state:

w.    The mother's episodes of passing out or nodding off are very concerning.  The
      mother could drop the baby if she were holding the child when she experienced
      one of these episodes.  These episodes also prevent the mother from being able
      to provide appropriate supervision for the child, which presents a risk to the child's
      physical safety.  The father is in denial regarding the significance of the mother
      having these episodes.

      . . . .

oo.   The child needs to remain in out-of-home placement because of the mother's
      untreated mental health needs; the mother's untreated medical or neurological
      condition and physical health; the father's unknown mental health status; the
      father's inability to recognize signs of concern in the mother's behavior; the risk
      that the father would allow the mother to care for the child alone; and the risk that
      both parents together present to the child because of their inability to consistently
      meet the child's needs and provide safe care during their supervised visits.  The
      father is unable to pick up the slack, if the mother is unable to care for the child.

Smith cites Peredo's testimony that Smith told her he would "do whatever it takes" to care for P.H.V.S., including putting her in daycare. The unchallenged findings establish Smith also told Peredo that "the mother would care for the baby" and that he would "take the baby to work with him" even though Smith works outside doing landscaping.

The evidence showed Smith did not appreciate the seriousness of Gabhart's illness or understand Gabhart could not care for P.H.V.S. alone. Smith's niece Twiggs-Johns testified that she did not think Smith "understood the seriousness of [Gabhart's] condition." CPS social worker Madsen testified that Smith was unable to recognize "the severity of the situation" regarding Gabhart's physical and mental health issues. Peredo testified that Smith did not "seem to have understanding of the mother's limited capacity to take care of herself and an infant," and that P.H.V.S. would be at risk of neglect if placed in her parents' care. Madsen, Peredo, and hospital social worker Rice expressed concerns about Smith's ability to care for the child alone.[11]

Viewed in the light most favorable to the Department, substantial evidence supports the court's finding that Smith was not capable of adequately caring for P.H.V.S. such that she is in circumstances which constitute a danger of substantial damage to her psychological or physical development.

Reasonable Efforts to Eliminate Need for Removal

Gabhart contends insufficient evidence supports the finding that the Department "made reasonable efforts to prevent or eliminate the need for removal of the child from the child's home" and there was a "manifest danger" that P.H.V.S. "will suffer serious

---

[11] Finding of fact 2.2(aa) states:
On October 9, 2013, the father told Ms. Peredo that he had never been involved with mentally ill people or institutions and that he had never had a psychological evaluation. In the same conversation, the father then said that he had had a psychological evaluation and was put on medication, but he did not like it so he stopped taking the medication.

abuse or neglect if the child is not removed."

Following a fact-finding hearing, the court may enter a disposition placing the child in out-of-home care if it finds that (1) reasonable efforts have been made to prevent the need for removal, and preventative services have been offered or provided and have failed to prevent the need for removal; and (2) the Department proved by clear, cogent, and convincing evidence that a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home. RCW 13.34.130(5).[12] In determining placement of a child in a dependency proceeding, the court's paramount duty is to protect the best interests of the child. RCW 13.34.020; In re Dependency of J.B.S., 123 Wn.2d 1, 10, 863 P.2d 1344 (1993). This court reviews child placement decisions for abuse of discretion. In re Dependency of A.C., 74 Wn. App. 271, 275, 873 P.2d 535 (1994).

Here, the court found the Department "made reasonable efforts to prevent or eliminate the need for removal of the child from the child's home; but those efforts were unsuccessful because . . . [t]he health, safety, and welfare of the child cannot be adequately protected in the home." The court found "by clear, cogent and convincing evidence that a manifest danger exists that the child will suffer serious abuse or neglect

---

[12] RCW 13.34.130(5) states, in pertinent part:

An order for out-of-home placement may be made only if the court finds that reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home, specifying the services, including housing assistance, that have been provided to the child and the child's parent, guardian, or legal custodian, and that preventive services have been offered or provided and have failed to prevent the need for out-of-home placement, unless the health, safety, and welfare of the child cannot be protected adequately in the home, and that:

    (a) There is no parent or guardian available to care for such child;

    (b) The parent, guardian, or legal custodian is not willing to take custody of the child; or

    (c) The court finds, by clear, cogent, and convincing evidence, a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home and an order under RCW 26.44.063 would not protect the child from danger.

if the child is not removed."

Substantial evidence supports the court's findings. The evidence established Gabhart has a history of mental illness that prevents her from meeting the needs of the child. Gabhart also had multiple documented episodes where she appeared to suddenly lose consciousness, posing a safety risk to P.H.V.S. The Department provided Gabhart with medical care, mental health counseling, and medication management. Although Gabhart briefly reengaged in mental health services after P.H.V.S. was born, she discontinued treatment and stopped taking medication before the dependency fact-finding hearing.

The Department also provided Gabhart and Smith with a parent coach. While both parents improved their ability to feed and soothe P.H.V.S., Peredo and Frazier expressed serious concerns about the parents' ability to care for an infant.

Gabhart also argues that she and Smith could co-parent P.H.V.S. Gabhart's argument ignores the evidence that Smith was in denial about the seriousness of her mental and physical issues and he was "unable to pick up the slack" if she could not care for the baby.

Ineffective Assistance of Counsel

Gabhart contends her attorney provided ineffective assistance of counsel by conceding that she was not competent to testify and objecting to calling her as a witness at the dependency fact-finding hearing.

Parents have a statutory right to representation by counsel at all stages of a dependency proceeding. RCW 13.34.090(2); In re Dependency of V.R.R., 134 Wn. App. 573, 581, 141 P.3d 85 (2006). This right includes the right to effective legal

representation. V.R.R., 134 Wn. App. at 580.

To prevail on her claim of ineffective assistance of counsel, Gabhart must show (1) deficient performance by counsel and (2) resulting prejudice. In re Dependency of S.M.H., 128 Wn. App. 45, 61, 115 P.3d 990; Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

There is a strong presumption of effective representation of counsel, and Gabhart has the burden to show that based on the record, there are no legitimate strategic or tactical reasons for the challenged conduct. State v. McFarland, 127 Wn.2d 322, 335-36, 899 P.2d 1251 (1995).

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134[, 102 S. Ct. 1558, 71 L. Ed. 2d 783] (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. Louisiana[, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)].

Strickland, 466 U.S. at 689. If counsel's conduct can be characterized as legitimate trial strategy, it cannot provide the basis for a claim of ineffective assistance of counsel. State v. Aho, 137 Wn.2d 736, 745-46, 975 P.2d 512 (1999).

The Department identified Gabhart and Smith as potential witnesses to testify at the dependency fact-finding hearing. On the first day of the hearing, the attorneys

representing Gabhart and Smith moved to exclude the parents from testifying because the court had entered an order finding Gabhart and Smith were not competent and appointed a GAL to represent each parent. The court granted the motion and ruled that neither Smith nor Gabhart could testify.

> [T]hey've been found incompetent such that they need a guardian ad litem. . . . [I]f the parties can't understand the significance of the legal proceedings, I don't see how they can possibly testify competently. . . . [T]hey've been found incompetent. They can't assist their lawyers. That's why they have a GAL.

Gabhart contends there was no strategic reason to disclose that she was not competent or to object to her testifying at the hearing. We disagree.

First, the stipulation that Gabhart was not competent to testify merely reflected the order previously entered by the court. There is no dispute that before the dependency fact-finding, the court held a competency hearing, entered an order finding Gabhart not competent, and appointed a GAL.

Second, the record supports a legitimate strategic reason to prevent the Department from calling Gabhart as a witness. The Department's attorney told the court that without the parents' testimony, "I don't know how the Court could make a ruling on the parents' abilities to care for the child and their -- I think it would also inform their needs in terms of disposition." The attorney was also "concerned to lose the opportunity for the Court to observe the parents at all, which is what I feel I'm being denied."

In In re Welfare of Houts, 7 Wn. App. 476, 499 P.2d 1276 (1972), is distinguishable. In Houts, the attorney stipulated that the parents should not be present during the termination trial. Houts, 7 Wn. App. at 479. During an in-chambers

23

conference, the attorney also stipulated that the father was mentally ill. <u>Houts</u>, 7 Wn. App. at 480. A number of witnesses testified during the termination trial, including a psychiatrist who testified the mother suffered from chronic schizophrenia. <u>Houts</u>, 7 Wn. App. at 477-79. The court held that by not insisting on a competency hearing, the attorney "impliedly admitted that both his clients were either mentally incompetent or so far incompetent that they needed the protection of a guardian ad litem." <u>Houts</u>, 7 Wn. App. at 483.

> This implied admission became an express admission with respect to Mr. Houts . . . . The breadth of the stipulation was such as to substantially impair whatever chances Mr. and Mrs. Houts might otherwise have had to prevent entry of an order of permanent deprivation against the parents. Furthermore, their attorney's . . . stipulation that neither Mr. nor Mrs. Houts be present during the hearing of the state's case . . . did not conform to due process requirements.

<u>Houts</u>, 7 Wn. App. at 483-84.

Here, unlike in <u>Houts</u>, the court held a hearing on competency and appointed a GAL to represent Gabhart at the dependency fact-finding hearing. There is no dispute Gabhart and her GAL were present throughout the dependency fact-finding proceedings.

For the first time on appeal, Gabhart claims the court violated her right to due process by ruling that she could not testify. The right to be heard does not necessarily mean the right to give testimony. <u>In re Dependency of R.L.</u>, 123 Wn. App. 215, 223, 98 P.3d 75 (2004). Gabhart does "not challeng[e] the competency determination by the trial court." A witness who is not competent to testify has no right to testify. RCW 5.60.050. The court did not violate Gabhart's due process right by ruling she could not testify.

Gabhart also contends the court erred in ruling that her GAL could not "participate in trial" by questioning or cross-examining witnesses. Gabhart misrepresents the record.

Before the dependency fact-finding hearing began, the Department asked the court to clarify that the GAL would not be acting as Gabhart's attorney during the hearing and would not be permitted to question or cross-examine witnesses. Gabhart's GAL agreed. The GAL states it is his understanding that he was "simply here for purposes of assisting and providing such assistance as is necessary, but I would not be cross-examining." The court advised Gabhart's counsel to treat Gabhart's GAL "as if you're talking to your client."

Motion to Continue

Gabhart next argues the court erred in denying her motion to continue the dependency fact-finding hearing until she was found competent.

We review a trial court's decision to deny a continuance for manifest abuse of discretion. V.R.R., 134 Wn. App. at 580. A trial court abuses its discretion when it exercises that discretion based on untenable grounds or reasons. State ex rel Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). In deciding a motion to continue, the trial court takes into account a number of factors, including due diligence, due process, the need for an orderly procedure, the possible effect on the fact-finding hearing, and whether prior continuances were granted. V.R.R., 134 Wn. App. at 581. To show that the denial of a continuance violated the right to due process, an appellant must show that either she was prejudiced by the denial, or that the outcome would have been different if the continuance had been granted. V.R.R., 134 Wn. App. at 581.

At the beginning of the fact-finding hearing, Gabhart's attorney requested an indefinite continuance until Gabhart was found competent. The attorney proposed "set hearings" where "we would check in and determine whether or not Ms. Gabhart is competent." The Department opposed a continuance, arguing that RCW 13.34.020 guarantees a child the right to "speedy resolution" of a dependency proceeding. The court denied the request.

RCW 13.34.070(1) requires a court to hold a fact-finding hearing on a dependency petition "no later than seventy-five days after the filing of the petition, unless exceptional reasons for a continuance are found." Here, the dependency fact-finding hearing had already been continued twice. And as the court noted, "Even if there was a date you could come up with that you think your client might become competent, as you said . . . , people go in and out of competency." The court did not abuse its discretion in denying Gabhart's request to continue.

We affirm.

WE CONCUR:

Cox, J.